COMMONWEALTH of Pennsylvania,
Appellee

v.

Ford James BRUCE, Appellant.

Superior Court of Pennsylvania.

Argued Sept. 19, 2006.
Filed Jan. 4, 2007.

Wayne P. McGrew, Greensburg, for appellant.

Wayne B. Gongaware, Assistant District Attorney, Greensburg, for Commonwealth, appellee.

BEFORE: STEVENS, TODD, and McCAFFERY, JJ.

OPINION BY STEVENS, J.:

¶ 1 This is an appeal from the judgment of sentence entered in the Court of Common Pleas of Westmoreland County after a jury convicted Appellant of aggravated assault, involuntary manslaughter, simple assault, and reckless endangerment. Sentenced to consecutive sentences of five to fifteen years' imprisonment for aggravated assault and one to two years for involuntary manslaughter, Appellant filed post-sentence motions, which the court denied. Appellant herein challenges the court's evidentiary rulings, the sufficiency and weight of the evidence, and the sentence imposed.[1] We affirm.

¶ 2 The evidence adduced at trial was that Appellant walked to the parked car of the victim, his friend Danne McCutcheon, and delivered through the open driver's side window four punches to the face and throat of the seated McCutcheon. McCutcheon's wife testified that she ran down to McCutcheon's car immediately after the attack to find McCutcheon sitting in the driver's seat with his head leaning back toward the middle of the car, blood coming from his mouth, and immobilized. He remained behind the wheel in this reclined position upon the arrival of paramedics, who described him as "clinically dead" at that point.

¶ 3 The cause of death, according to the expert testimony of Dr. Cyril Wecht, a physician specializing in anatomic, clinical, and forensic pathology, was a complete tear through the left vertebral artery, caused by the sharp, sudden, angular rotational twisting of McCutcheon's neck. Dr. Wecht identified as the manner of death blunt force trauma to the lower face, consistent with a punch, as indicated by a contusion laceration of McCutcheon's lip. Appellant denied confronting McCutcheon with the intent to inflict harm, and claimed that he sought only to discuss allegations made by Appellant's girlfriend that McCutcheon had raped her the night before. According to Appellant, he became physical only after McCutcheon refused to talk, got in his car with his children, and then made what Appellant construed as a sarcastic remark about the alleged rape.

¶ 4 Appellant first contends that "[t]he jury's verdict of guilty in both the aggravated assault and involuntary manslaughter charges rendered the verdict inconsistent [thus warranting a new trial]." Brief for Appellant at 8. Because the crux of Appellant's argument in support of this issue is in fact no more than a challenge to the sufficiency of the evidence supporting his aggravated assault conviction, we pro-

---

1. In addition to his counseled brief, which advances seven issues for our review, Appellant has filed a *pro se* packet of his own observations offered in support of the claims he raises. If, as here, an attorney files a standard advocate's brief, a *pro se* brief shall not be considered. *See Commonwealth v. El-* lis, 534 Pa. 176, 626 A.2d 1137 (1993) (prohibiting "hybrid representation," *i.e.,* precluding review of a defendant's *pro se* brief if he is represented by counsel); *Commonwealth v. Baney,* 860 A.2d 127 (Pa.Super.2004). Accordingly, we confine our review of Appellant's claims to his counseled advocate's brief.

ceed to Appellant's sufficiency claim raised in his second issue.

¶ 5 Appellant's sufficiency challenge is based on the argument that the Commonwealth failed to prove he acted with requisite *mens rea.* We disagree.

¶ 6 Our test for the sufficiency of the evidence is well-settled:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying [the above] test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Frisbie,* 889 A.2d 1271, 1274–75 (Pa.Super.2005) (citations and quotations omitted).

¶ 7 Under the Crimes Code, a person may be convicted of aggravated assault, graded as a felony of the first degree punishable by a maximum term of incarceration of twenty years, if he or she "attempts to cause serious bodily injury to another, or causes such injury intentionally, knowingly, or recklessly under circumstances manifesting extreme indifference to the value of human life." 18 Pa.C.S.A. § 2702(a)(1). Serious bodily injury is further defined by the Crimes Code as "bodily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." 18 Pa.C.S.A. § 2301.

¶ 8 Where, as here, the victim suffered serious bodily injury, the Commonwealth may establish the *mens rea* element of aggravated assault with evidence that the assailant acted either intentionally, knowingly, or recklessly.[2] Looking first to whether evidence established intent to cause serious bodily injury, we note that such an inquiry into intent must be determined on a case-by-case basis. *Commonwealth v. Dailey,* 828 A.2d 356 (Pa.Super.2003). Because direct evidence of intent is often unavailable, intent to cause serious bodily injury may be shown by the circumstances surrounding the attack. *Commonwealth v. Caterino,* 451 Pa.Super. 42, 678 A.2d 389 (1996). In determining whether intent was proven from such circumstances, the fact finder is free to conclude "the accused intended the natural and probable consequences of his actions to result therefrom." *Commonwealth v. Rosado,* 454 Pa.Super. 17, 684 A.2d 605, 608 (1996).

¶ 9 Circumstances deemed probative in this inquiry have included evidence that the assailant was disproportionately

2. The jury instruction explained each of these three *mens rea* possibilities.

larger or stronger than the victim, that the assailant had to be restrained from escalating his attack, that the assailant had a weapon or other implement to aid his attack, or that the assailant made statements before, during, or after the attack which might indicate his intent to inflict further injury. *Commonwealth v. Alexander,* 477 Pa. 190, 194, 383 A.2d 887, 889 (1978). Depending on the circumstances, "even a single punch may be sufficient." *Dailey,* 828 A.2d at 360. *See also Alexander,* 477 Pa. at 194, 383 A.2d at 889 ("We hasten to add that a simple assault combined with other surrounding circumstances may, in a proper case, be sufficient to support a finding that an assailant attempted to inflict serious bodily injury, thereby constituting aggravated assault.").

¶ 10 The aggravated assault statute is not, however, a strict liability statute. *Commonwealth v. Roche.* 783 A.2d 766, 770 (Pa.Super.2001). Thus, showing that a single punch caused serious bodily injury does not necessarily sustain a conviction for aggravated assault unless the circumstances establish that the assailant acted with the requisite *mens rea* under the statute. *Id.*

¶ 11 In *Roche, supra,* the appellant verbally provoked a much smaller bar patron who declined his invitation to arm wrestle, and then punched the patron in the eye as the patron was attempting to leave the bar. The single punch left the patron's eye seriously injured. In vacating the appellant's aggravated assault conviction, this Court determined that the Commonwealth failed to prove the appellant acted with intent to cause serious bodily injury.

> Appellant's belligerent words and the throwing of one punch are in and of themselves insufficient factors to support the conclusion that Appellant had the requisite intent to cause serious bodily injury when he struck the victim.

During the initial encounter in the bar, Appellant did not threaten the victim with harm or injury but merely challenged him to arm wrestle and briefly pushed the victim when the victim declined his offer. When the victim exited the bar and Appellant followed, Appellant again did not specifically threaten the victim with injury or insinuate that he would cause physical harm to the victim, aside from Appellant's childish inquiry as to whether the victim thought he was a "tough guy." After Appellant delivered his lone, ill-advised punch with his hand, he ceased his attack immediately and did not engage in further physical contact with the victim. Though the victim was defenseless, Appellant did not continue to strike the victim while the victim was lying motionless on the ground nor did Appellant pursue or extend his attack to the victim's companion. Moreover, and importantly, Appellant did not possess or use a weapon or other instrumentality of harm at any time before or during the attack. While Appellant's actions certainly demonstrated the sufficient requisite intent to sustain his conviction for simple assault, in that they showed that he acted with the intent to cause Appellant bodily injury, they were not so egregious or sustained to suggest that he legally possessed the specific intent to inflict *serious* bodily harm when he punched [the victim] once.

*Id.* at 770–71.

¶ 12 Present in *Dailey, supra,* however, was a key circumstance absent in *Roche.* The appellant in *Dailey* appealed his conviction under Section 2702(a)(2) (attempting to cause serious bodily injury to a corrections officer). The record revealed that the appellant had rendered the victim corrections officer "dazed" and helpless with two punches to the head and moved

toward the victim in a boxing stance, ready to deliver another punch, before other corrections officers subdued him. This Court held that evidence showing the appellant intended to strike again a dazed and helpless victim sufficed to establish intent to cause serious bodily injury. *Id.* at 360–61.

¶ 13 As in *Dailey*, particular circumstances surrounding the four or five punches landed by Appellant support a finding that he intended to inflict serious bodily injury upon McCutcheon. First, strong reason existed to believe Appellant harbored raw anger against McCutcheon for allegedly raping Appellant's girlfriend in a motel room just the night before. After telling his girlfriend that he was "tired of his friends fucking him over," Appellant tried to find McCutcheon but could not locate him early in the day. Likely adding to the animus, moreover, was a phone conversation later that day between Appellant and McCutcheon where McCutcheon deflected Appellant's questions about the rape and instead took the offensive, calling Appellant a "marked man" for informing police about a motorcycle presumably stolen by McCutcheon. Appellant told McCutcheon he was coming to McCutcheon's house to talk, but McCutcheon said he was preparing to go out. Appellant drove the four minute drive directly to McCutcheon's home anyway, and found McCutcheon exiting the home and loading his two children into his car. McCutcheon again avoided Appellant and entered his car, from where, according to Appellant, he then asked "how [Appellant's girlfriend] was doing after last night," the final words McCutcheon would ever speak. The prelude to the attack, therefore, was not merely an episode of "childish" barroom bullying as in *Roche*, but involved a betrayed man's frustrating, day-long pursuit of an evasive and defiant friend who allegedly raped the man's girlfriend.

¶ 14 The manner of the attack itself likewise reflects an intent to inflict serious harm. Appellant approached the car with McCutcheon already seated inside and attacked through the open window, throwing what the one juvenile witness described as a "sucker punch."[3] The highly advantageous position outside of driver's side window allowed him to strike a seated McCutcheon who was effectively trapped in a small space. Neither juvenile witness, the girl in the passenger seat or the boy watching the episode from McCutcheon's front porch, said McCutcheon mounted any resistance. Yet, Appellant struck him four or five times in the face and throat with punches, at least one of which was forceful enough to twist his neck so sharply that it severed a vertebral artery. Appellant did cease his attack on what was clearly an incapacitated McCutcheon, but promised as he walked away that he "wasn't done yet."

¶ 15 Therefore, this combination of animus, an element of surprise (attacking while victim's children are in the car), a victim essentially trapped inside his car, multiple strikes to the face and throat of a victim unable to fight back, at least one punch forceful enough to twist the victim's neck sharply, and parting words that more violence was to come all elevated what would otherwise typically be a simple assault with one's bare hands to an aggravated assault. The specific intent to inflict serious bodily harm is reasonably inferred from these circumstances, such that the evidence sufficed to sustain Appellant's conviction for aggravated assault.

---

**3.** Merriam Webster's Collegiate Dictionary 1176 (10th ed.1997) defines "sucker punch" as "to punch (a person) suddenly without warning and often without apparent provocation."

¶ 16 The same conclusion is drawn were we to examine the record under the statute's alternate *mens rea* element of recklessness. To prevail on a theory of recklessness, the Commonwealth must show an assailant's recklessness rose to the level of malice, a crucial element to sustain a conviction for aggravated assault. *Commonwealth v. Kling,* 731 A.2d 145 (Pa.Super.1999). "Malice" was explained in *Kling:*

> Malice exists where there is a "wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty, although a particular person may not be intended to be injured." *Commonwealth v. Pigg,* 391 Pa.Super. 418, 571 A.2d 438, 441 (1990), *appeal denied,* 525 Pa. 466, 581 A.2d 565 (1990) (quoting *Commonwealth v. Drum,* 58 Pa. 9, 15 (1868)). Where malice is based on a reckless disregard of consequences, it is not sufficient to show mere recklessness; rather, it must be shown the defendant consciously disregarded an unjustified and extremely high risk that his actions might cause death or serious bodily injury. *See Commonwealth v. Scales,* 437 Pa.Super. 14, 648 A.2d 1205, 1207 (1994), *appeal denied,* 540 Pa. 640, 659 A.2d 559 (1995) (regarding third degree murder). A defendant must display a conscious disregard for almost certain death or injury such that it is tantamount to an actual desire to injure or kill; at the very least, the conduct must be such that one could reasonably anticipate death or serious bodily injury would likely and logically result. *See [Commonwealth v.] O'Hanlon, supra,* [539 Pa. 478,] 653 A.2d [616] at 618 [ (1995) ] (regarding aggravated assault).

*Kling,* 731 A.2d at 147–48.

¶ 17 The circumstances showing intent to cause serious bodily injury apply with equal force to prove recklessness to a degree that one would reasonably anticipate serious bodily injury as a likely and logical result. Appellant delivered four or five blows to the face and throat of man confined to a seated position and unprepared for the attack. Appellant, however, points to the minimal external injury to McCutcheon's face, which bore only a small contusion/laceration on the lip, as evidence that he could not have reasonably anticipated serious injury to occur from his punches. To that same end, Appellant directs us to the portion of Dr. Cyril Wecht's testimony where the doctor states that he could not infer from the arterial tear itself that a great deal of force accompanied Appellant's punch.

¶ 18 A reviewing of Dr. Wecht's testimony shows that he could not determine how much force was delivered by the punch that severed McCutcheon's vertebral artery because "that would depend, as I said, on the positions and whether it's the end of the blow, or so on." N.T. 2/15–18/05 at 249. Dr. Wecht opined, however, that "[y]ou don't have to be punched by the heavyweight champion of the world[]" to cause the neck to turn as McCutcheon's did, "it does not require a punch of great magnitude from a professional boxer." N.T. at 249. Yet, Dr. Wecht had made clear elsewhere in his testimony that "[t]he way in which this injury occurs, the mechanical dynamic of this is a sharp sudden angular rotational twisting of the neck, and hyperextension. . . . If the head is thrust backward abruptly, hyperextension, kind of an exaggerated whiplash injury that we've all heard so much about, and/or acute angular rotation[], . . . that would be the mechanical dynamic of the injury. . . ." N.T. at 225–26. Dr. Wecht also identified McCutcheon as an otherwise healthy man who possessed no disease process making him peculiarly vulnerable to the arterial tear he suffered.

¶ 19 While Dr. Wecht was thus unable to quantify the force delivered by the lethal blow as "great" or the equivalent of that produced by a champion heavyweight boxer, he did identify that McCutcheon's neck underwent a "sharp, sudden angular rotational twisting of the neck" and/or hyperextension comparable to an exaggerated whiplash injury, and that the punch correlated to that injury. A jury could reasonably infer from this testimony that a punch forceful enough to cause the harsh mechanical dynamic associated with the injury was forceful enough to cause reasonable anticipation of serious injury from its delivery.

¶ 20 Moreover, to Appellant's argument that the punches failed to cause widespread bruising, dislodged teeth, or a broken jaw—perhaps more common results of a fierce blow the chin or mouth—we find it inconsequential where there is still clear evidence that the blow caused McCutcheon's neck to twist so sharply. The recklessness standard here does not require reasonable anticipation of the precise serious injury that results from an attack, just that some serious injury related to the attack will occur. Snapping one's neck harshly to the side with a sucker punch amid a flurry of other punches is to act with disregard to the likely serious bodily injury that will follow. Accordingly, we would find the aggravated assault conviction also supported by evidence of Appellant's recklessness as defined under the statute.

¶ 21 Taking Appellant's issues out of turn, we next address his weight of the evidence challenge, as it implicates most of the evidence already discussed in the sufficiency review.

An allegation that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. A trial judge must do more than reassess the credibility of the witnesses and allege that he would not have assented to the verdict if he were a juror. Trial judges, in reviewing a claim that the verdict is against the weight of the evidence[,] do not sit as the thirteenth juror. Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.

*Commonwealth v. Widmer,* 560 Pa. 308, 319–20, 744 A.2d 745, 751–52 (2000). (citations, quotation marks, and footnote omitted). In other words, a court may grant a new trial because the verdict is against the weight of the evidence only when the verdict rendered is so contrary to the evidence as to shock one's sense of justice. *Commonwealth v. Goodwine,* 692 A.2d 233, 236 (Pa.Super.1997). The determination of whether to grant a new trial rests within the discretion of the trial court, and we will not disturb this determination absent an abuse of discretion. *Commonwealth v. Young,* 692 A.2d 1112, 1114 (Pa.Super.1997).

¶ 22 The sum of Appellant's weight challenge is that this case involved "a peculiar circumstance where a blow carrying minimal force and inflicting minimal external damage resulted in a rare fatal injury[]" such that Appellant could not have acted with specific intent or malice. We disagree.

¶ 23 Again, while Dr. Wecht could not precisely quantify the force behind the blow that caused McCutcheon's neck to twist, the jury could reasonably infer from his explanation that a sharp, sudden rotation or exaggerated whiplash motion is

associated with a vertebral artery tear that the punch delivered sufficient force to a vital area so as to bring it under the aggravated assault statute. It is no less reasonable to make this inference in light of the testimony of Appellants' own forensic pathologist, Dr. Eric Lee Vey. Dr. Vey testified that McCutcheon's consumption of drugs and alcohol before the incident could have made him more lax and contributed to the rotation of his neck upon impact. Furthermore, Dr. Vey found instances reported where people engaged in common physical activities have suffered torn vertebral arteries.

¶ 24 Dr. Wecht himself noted reports chronicling spontaneous arterial tears and the potential for intoxication to increase vulnerability to the injury, but he qualified the probity of such reports. Tears occurring during common physical activities were "extremely rare, and most likely with someone who is ... elderly, and doesn't have good structure of those anatomical parts to begin with, and so on." Alcohol can also make an individual more susceptible, Dr. Wecht explained, where "someone is under the influence, a *significant* level, the looseness, the diminished degree of awareness, and the laxity which plays out with motor coordination and motor—voluntary motor awareness...." N.T. at 229–230.

¶ 25 The jury, therefore, was free to conclude from the body of evidence that the occurrence of this injury in other unrelated contexts was of low probative value, as was the influence of alcohol or drugs, as there was no eyewitness testimony that McCutcheon exhibited a diminished degree of awareness or coordination. A reasonable inference from the evidence was that Appellant delivered a forceful, surprise flurry of punches to which McCutcheon would have been unprepared to brace himself whether or not he was intoxicated at the time. Accordingly, the jury's verdict does not shock one's sense of justice in this case.

¶ 26 Appellant next challenges the discretionary aspects of his sentence. Specifically, he contends the court committed error in considering two PFA orders and in considering the death of the victim in fashioning his aggravated assault when he was already facing sentence for involuntary manslaughter.

¶ 27 With respect to discretionary aspect of sentencing challenges, the Pennsylvania Rules of Appellate Procedure require that:

An appellant who challenges the discretionary aspects of a sentence in a criminal matter *shall* set forth in his brief a concise statement of the reasons relied upon for allowance of appeal with respect to the discretionary aspects of a sentence. The statement *shall* immediately precede the argument on the merits with respect to the discretionary aspects of sentence.

Pa.R.A.P. 2119(f) (emphasis added). Appellant has failed to include the requisite Rule 2119(f) statement. A failure to include the Rule 2119(f) statement does not automatically waive an appellant's argument; however, we are precluded from reaching the merits of the claim when the Commonwealth lodges an objection to the omission of the statement. *Commonwealth v. Hudson*, 820 A.2d 720, 727 (Pa.Super.2003). Here, the Commonwealth has objected to Appellant's omission of the Rule 2119(f) statement. *See* Brief for Appellee at 8. Accordingly, we conclude that Appellant has waived his challenge to the discretionary aspects of his sentence. *See Hudson, supra.*

¶ 28 Appellant alleges next that his constitutional right to confrontation was violated when the trial court permit-

ted the Commonwealth to admit into evidence, over hearsay objections, the forensic neuropathology report and the narrative of facts and observations in the autopsy report prepared by Dr. Bennet Omalu, a staff member of Dr. Wecht's private forensic pathology practice who was not present to testify and thus unavailable for cross-examination. Expert testimony was supplied, instead, by Dr. Wecht. Because the record demonstrates Dr. Wecht was personally engaged in McCutcheon's autopsy and exhibited a high level of expertise both in general and specific to this case, we determine that Appellant was afforded his constitutional right to confront and cross-examine with respect to the reports admitted against him.

¶ 29 Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. Pa.R.E. 801. Hearsay is generally inadmissible at trial unless it falls into an exception to the hearsay rule. *Commonwealth v. McEnany*, 732 A.2d 1263, 1272 (Pa.Super.1999). *See also* Pa.R.E. 802. Clearly, the factual narrative portion of the autopsy report and the entire neuropathology report admitted into evidence constituted a written statement by an out of court declarant, Dr. Omalu, intended to prove the truth of the matter asserted with respect to the cause and manner of death. In that respect, the reports constituted hearsay evidence.

¶ 30 At trial, there was no suggestion that the reports qualified for any exception to the Rule against Hearsay. Rather, the trial court sought to avoid the hearsay problem altogether by admitting them for the "limited purpose of completing the record in the case, *being available for further review in the case. But they will not be available to the jury.* They are for the limited purpose of being a record of what Dr. Wecht ultimately depended upon for the basis of his opinions.... That's all. They are for those illustrative purposes." N.T. at 214. (emphasis added).

¶ 31 Despite the limitations placed on the admission of the reports themselves, the ruling did not prevent the jury from learning through Dr. Wecht's detailed and specific testimony of the factual observations, results, and diagnoses of the autopsy as recorded in the two reports. In this way, hearsay evidence on a critical element of the case, cause and manner of death as determined by the autopsy and recorded in the reports, still reached the jury. The question then becomes whether the admission of such hearsay was harmless error or if it denied Appellant his constitutional right of confrontation. *See Commonwealth v. Raab*, 845 A.2d 874, 877 (Pa.Super.2004) (stating "we recognize that 'where the evidence at issue does not satisfy an exception to the hearsay rule, confrontation rights [under the United States and Pennsylvania Constitutions] are implicated.'" (citation omitted).

¶ 32 In the context of a violation of a defendant's constitutional right to confront the witnesses against him, it has been held:

An error will be deemed harmless where the appellate court concludes beyond a reasonable doubt that the error could not have contributed to the verdict. If there is a reasonable possibility that the error may have contributed to the verdict, it is not harmless. In reaching that conclusion, the reviewing court will find an error harmless where the uncontradicted evidence of guilt is overwhelming, so that by comparison the error is insignificant. The burden of establishing that the error was harmless rests upon the Commonwealth.

*Commonwealth v. Mitchell*, 576 Pa. 258, 839 A.2d 202, 214–15 (2003).

¶ 33 In *Commonwealth v. McCloud*, 457 Pa. 310, 322 A.2d 653 (1974), the Pennsylvania Supreme Court addressed whether the defendant's right to confrontation and cross-examination was violated when portions of an autopsy report opining about the victim's cause of death was read into evidence without making the authoring medical examiner available to testify. The Court reasoned that it could delineate admissible hearsay from inadmissible hearsay in this context by assessing the purpose of admitting the report into evidence and the risks inherent in its admission. *Id.* at 655.

> If [the report] is offered to prove an essential element in the crime or connect the defendant directly to the commission of the crime, then [it] must be proved through persons having personal knowledge of the element or connection and such persons must be available to testify for cross-examination.

*Id.* Because the portions of the autopsy report read into the record offered opinion evidence as to the cause of death, it was necessary to make the authoring medical examiner available for cross-examination on his opinions and conclusions. *Id.* As it was, reading the autopsy report into the record to establish the cause of death "denied [the defendant] the fundamental constitutional right of confrontation and was error." *Id.*

¶ 34 More recently, a panel of this Court in *Commonwealth v. Carter*, 861 A.2d 957 (Pa.Super.2004) found a confrontation clause violation in the admission of a lab report identifying cocaine in defendant's possessions where the testimony accompanying the report came from the crime lab manager who had no personal knowledge of the report. During trial, the Commonwealth called the lab manager to the stand to describe his role as custodian of the report and the process by which the report would have been generated. After he described the laboratory process at hand, the Commonwealth moved for admission of the lab report pursuant to the business records exception to the hearsay rule, which motion the court granted. The lab manager was then given a copy of the lab report regarding the content of defendant's possessions and was asked to read out loud from the report. It was undisputed that the lab manager was able to testify, therefore, based only on the information he could read from the report, as he had no personal involvement or knowledge of the case otherwise.

¶ 35 On appeal, this Court first determined that the trial court erred in applying the business records exception to a laboratory report that was prepared in anticipation of litigation. Because the admission of inadmissible hearsay does not always equate with a confrontation clause violation, however, the Court turned to the question of whether admission of the laboratory report was harmless error.

■ ¶ 36 A review of both *McCloud* and extrajurisdictional decisions regarding harmless error in the event of admitted hearsay in this context yielded that the right of confrontation may be satisfied under certain circumstances. Where the expert testifying is not the actual performer of the lab test erroneously admitted into evidence, the defendant's right to confront and cross-examine may still be satisfied where a highly qualified testifying expert had a close connection with and personal knowledge of the testing in the case. *Id.* at 966.

¶ 37 Cases identified by *Carter* as relying on the expert's "close connection" to find harmless error included the Tennessee case of *State v. Kennedy*, 7 S.W.3d 58 (Tenn.Crim.App.1999), where a lab super-

visor testifying as an expert had direct participation in checking the forensic scientist's findings, was subject to cross-examination, and based his opinion on the type of inadmissible hearsay reasonably relied upon by experts in that situation. *Carter*, 861 A.2d at 965–66 (quoting *Kennedy*, 7 S.W.3d at 66, 67 n. 8). The *Carter* Court noted, however, that a critical difference between its facts and those in *Kennedy* was that, in *Kennedy*, the actual lab report was not admitted.

> [R]ather, the results of the report came in through the testimony of the lab supervisor, who was proffered as an expert witness and who had a close connection to the testing such that 'the defense was able to thoroughly cross-examine [him] as to the samples, procedures, safeguards, and results reached' in the particular case.

*Carter*, 861 A.2d at 966 (citation omitted).

¶ 38 Another case on which *Carter* relied held that, even where the lab report itself was erroneously admitted as an exception to hearsay, there may still exist circumstances where the right of confrontation is preserved. In *State of Wisconsin v. Williams*, 253 Wis.2d 99, 644 N.W.2d 919 (Wis.2002), the court there reasoned that the right to confront and cross-examine is preserved by the admission of expert testimony based upon the lab results, so long as the testifying expert was highly qualified and had a close connection with the testing in the case. *Id.* at 925 (cited by *Carter*, 861 A.2d at 966).

¶ 39 Applying the principles enunciated in *McCloud, Kennedy,* and *Williams,* this Court in *Carter* concluded that admitting the lab report without the testimony of the forensic scientist who performed the testing and prepared the report violated the defendant's right to confrontation. The Court based this conclusion on the following reasons: (1) the lab manager who testified was not proffered as an expert but as a custodian of records to establish that the lab report was properly admitted as a business record; (2) even if the lab manager was proffered as an expert, his entire testimony merely repeated the information in the lab report, which would thus have remained inadmissible hearsay despite the fact that the lab manager would have been entitled to rely on it to form his own opinion; (3) the lab manager did not have the "close connection" to the actual testing like the witnesses in Kennedy and Williams, such that admission of the lab report could be deemed harmless error; and (4) the information in the erroneously admitted report was the only evidence establishing an essential element, *i.e.,* the presence of cocaine, such that, pursuant to *McCloud,* a witness with personal knowledge of the testing was required. *Carter*, 861 A.2d at 969.

¶ 40 When these same principles are applied to the present case, it is readily apparent that Dr. Wecht had personal knowledge of and a very "close connection" to McCutcheon's autopsy, subsequent brain dissection, and the reports generated therefrom. Called as an expert, Dr. Wecht exhibited a high-degree of expertise and spoke with great facility on all aspects of an autopsy in general, on the McCutcheon autopsy specifically, and on the type of injury that claimed McCutcheon's life. Though he neither performed nor attended the McCutcheon autopsy, he established that he personally examined McCutcheon's entire brain and portions of other body organs and tissues preserved after the autopsy. N.T. at 236. Similarly, though Dr. Wecht did not view the actual contusion to McCutcheon's lip, he did view the contusion in photographs. N.T. at 238.

¶ 41 As for the autopsy report itself, Dr. Wecht was personally responsible for its completion. He assembled the findings,

made the ultimate diagnosis, and signed his name at the end of the report. N.T. at 210, 235–36. The second report admitted at trial was a supplemental neuropathology report, completed by Dr. Omalu after he dissected McCutcheon's brain several weeks after the autopsy. Dr. Wecht did not author any part of the neuropathology report, but, again, critical to our inquiry is the fact that Dr. Wecht personally examined the dissected brain upon which the report was based.

¶ 42 Under this record, it is clear that Dr. Wecht had the kind of "close connection" to and personal knowledge of the McCutcheon autopsy, autopsy report and neuropathology report necessary to ensure that Appellant's right to confrontation was preserved when the court admitted the reports without the testimony of Dr. Omalu. Indeed, the record shows that Dr. Wecht not only capably answered all questions pertaining to the McCutcheon injury put to him on cross-examination, but he also did not disagree with the main defense theory that one could not necessarily infer from the vertebral arterial tear that a most forceful blow caused it. For these reasons, we find Appellant's confrontation clause challenge to be without merit.

¶ 43 Appellant next argues that sentencing him separately for both involuntary manslaughter and aggravated assault violated the Double Jeopardy Clause of the United States and Pennsylvania Constitutions because the same punches were the underlying factual basis for both offenses. We have held that the same inquiry is involved in determining whether double jeopardy is violated and whether crimes are greater or lesser included offenses and therefore merge for sentencing purposes. *Commonwealth v. Anderson*, 538 Pa. 574, 580, 650 A.2d 20, 23 (1994). Where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether they are two offenses or only one is whether each provision requires proof of a fact which the other does not. *Commonwealth v. Comer*, 552 Pa. 527, 716 A.2d 593 (1998). Here, the involuntary manslaughter offense requires, *inter alia*, proof of death of a victim, while the aggravated assault requires, inter alia, proof of acting with malice. Thus, each offense requires proof of a fact which the other does not. Accordingly, imposing separate sentences for involuntary manslaughter and aggravated assault in this case did not implicate double jeopardy.

¶ 44 Appellant's final challenge is to the admission of photographic evidence depicting his appearance on the morning following McCutcheon's death. Appellant contends the photographs were both irrelevant and deliberately designed to prejudice the jury against him for being a "rougher biker type person." Brief for Appellant at 17.

¶ 45 Appellant does not direct us to where in the substantial record the photographs were admitted into evidence, but the Commonwealth's brief does. Our review of the relevant part of the transcript shows that the defense offered no objection to the admission of the photographs.

**PROSECUTOR:** Are Commonwealth's Exhibits Nos. 4, 5, and 6 fair and accurate depictions of how Mr. Bruce's hands appeared on June 13th, 2004, and how Mr. Bruce appeared on June 13, 2004?

**WITNESS, STATE TROOPER MARCHEWKA:** Yes, sir.

**PROSECUTOR:** I would ask for the admission of Commonwealth's Exhibits Nos. 4, 5, and 6, Your Honor.

**THE COURT:** Any objection?

**DEFENSE COUNSEL:** No, Your Honor.

N.T. at 154.

¶ 46 Such failure to offer a timely and specific objection results in waiver of this claim. *Commonwealth v. Guilford,* 861 A.2d 365 (Pa.Super.2004). Even if we were to find the issue preserved, moreover, the photographs were used to depict the swelling in Appellant's right hand, the hand the Commonwealth claimed Appellant used to strike McCutcheon repeatedly. Used for this purpose, the photographs were clearly relevant and admissible. There exists, therefore, no merit to Appellant's final claim even if it were properly preserved for our review.

¶ 47 For the foregoing reasons, we affirm judgment of sentence.

¶ 48 Affirmed.