J-S17027-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| JUSTIN EDWARD THOMAS, | |
| Appellant | No. 1006 WDA 2014 |

Appeal from the PCRA Order Entered May 24, 2014
In the Court of Common Pleas of Westmoreland County
Criminal Division at No(s): CP-65-CR-0004562-2009

BEFORE:  GANTMAN, P.J., SHOGAN, and FITZGERALD,[*] JJ.

MEMORANDUM BY SHOGAN, J.:                    **FILED APRIL 10, 2015**

Justin Edward Thomas ("Appellant") appeals from the order dismissing his petition for collateral relief filed pursuant to the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. §§ 9541–9546.  We affirm.

We have gleaned the relevant facts and procedural history of this case from the record as follows:  Appellant and Nicole Keppler ("Ms. Keppler") are the parents of a daughter, S.T.  Appellant was alone with then three-week-old S.T. during the afternoon hours of September 21, 2009.  When Ms. Keppler left Appellant and S.T. around noon that day, S.T. was in good health and was drinking from a bottle.  Several hours later, Appellant

_____

[*]  Former Justice specially assigned to the Superior Court.

telephoned Ms. Keppler and stated that S.T. would not wake up. When Ms. Keppler returned home, S.T. was unresponsive. Appellant and Ms. Keppler took S.T. to Conemaugh Hospital in Johnstown. From there, S.T. was transferred to Children's Hospital of Pittsburgh. S.T. was diagnosed with a subdural hematoma and retinal bleeding resulting from physical abuse. As a result of her severe brain injuries, S.T. requires a feeding tube and is unable to speak or sit by herself. Appellant was twenty years old at the time of the incident.

When questioned by Detective Robert Weaver of the Westmoreland County Detective Bureau, Appellant stated that he had been playing a game with S.T. while she was lying on his lap; the game involved pumping S.T.'s arms up and down while saying, "choo choo." Appellant told Detective Weaver that he may have shaken S.T. too hard during the game. As a result of Detective Weaver's investigation, Appellant was charged on October 8, 2009, with aggravated assault, endangering the welfare of children, and recklessly endangering another person.

While waiting for discovery from the Commonwealth, appointed trial counsel began searching for a pediatric radiologist to serve as an expert but encountered difficulty in finding a suitable candidate. In the meantime, trial counsel reached out to an acquaintance, forensic pathologist Dr. Karl Williams, Chief Medical Examiner of Allegheny County, who provided *pro bono* assistance to Appellant's defense. Based on Dr. Williams'

recommendation, trial counsel contacted Dr. James Smith, Chief Medical Examiner of Beaver and Lawrence Counties. Dr. Smith was familiar with the Commonwealth's expert, Dr. Janice Squires. After speaking with Dr. Smith, trial counsel petitioned for and received fees to hire him as an expert. Order, 9/22/10. Based on their review of S.T.'s medical records, Drs. Williams and Smith suggested that trial counsel contact Dr. Patrick Barnes, a pediatric radiologist from Stanford Hospital, because of his expertise in "shaken baby syndrome."[1] To enlist Dr. Barnes' expertise, trial counsel again requested fees from the trial court. Following a hearing, the trial court denied trial counsel's request. Order, 4/23/12.

Appellant entered a negotiated guilty plea on June 5, 2012, to all three charges. At the guilty plea hearing, the trial court heard testimony from Ms. Keppler, Detective Weaver, and Appellant. The trial court conducted an oral guilty plea colloquy, and Appellant completed a written guilty plea colloquy. Appellant was sentenced the same day to incarceration for a term of six to

---

[1] "A diagnosis of Shaken Baby Syndrome . . . indicates that a child found with the type of injuries described above has not suffered those injuries by accidental means. Thus, . . . expert testimony shows that the child was intentionally, rather than accidentally injured." **Commonwealth v. Smith**, 956 A.2d 1029, 1038 n.5 (Pa. Super. 2008) (quoting **Commonwealth v. Passarelli**, 789 A.2d 708, 715 (Pa. Super. 2001)) (internal quotation marks and brackets omitted).

twelve years, followed by five years of probation.[2] Appellant did not file post-sentence motions or a direct appeal.

On June 3, 2013, Appellant filed a timely *pro se* PCRA petition, raising claims of an invalid guilty plea allegedly caused by trial counsel's ineffective assistance. Counsel filed an amended petition on November 12, 2013. The PCRA court held an evidentiary hearing on February 27, 2014, at which trial counsel testified regarding his unsuccessful search for a pediatric radiologist, consultation with Dr. Williams, and his retention of Dr. Smith as a medical expert. N.T. (PCRA), 2/27/14, at 10–30. According to trial counsel, both Drs. Williams and Smith advised him to contact Dr. Barnes. *Id.* at 15–16. Trial counsel stated that Dr. Smith would be able to provide a "good defense," but Dr. Barnes could have testified "beyond reproach" to diagnostic tests that could have been conducted to rule out other possible causes of S.T.'s injuries, such as a genetic condition. *Id.* at 20–21. Trial counsel explained that his defense strategy was to argue that Appellant did not hurt S.T. intentionally or negligently. *Id.* at 34–36. When his motions to exclude Appellant's damaging statements to Detective Weaver were denied, trial counsel believed a plea was advisable. *Id.* at 43.

---

[2] If convicted, Appellant faced possible incarceration for twelve and one-half to twenty-five years. N.T. (Motion), 4/23/12, at 9; N.T. (Plea), 6/5/12, at 36–38.

The PCRA court denied Appellant's petition, concluding that "the colloquy between the Court and [Appellant] more than satisfies the requirement that the defendant was freely, knowingly, intelligently and voluntarily entering his plea of guilty to the charges" and that trial counsel was not ineffective. PCRA Court Opinion, 5/24/14, at 9. This appeal followed.

Appellant states two questions for our consideration:

I.    Was Appellant's plea counsel constitutionally ineffective because he initially retained the wrong type of medical expert to properly defend the case?

II.   Was Appellant's plea counsel constitutionally ineffective because he failed to counsel Appellant at the plea hearing that his plea lacked a sufficient factual basis?

Appellant's Brief at 3.

Our standard of review of an order denying PCRA relief is whether the record supports the PCRA court's determination and whether the PCRA court's determination is free of legal error. *Commonwealth v. Phillips*, 31 A.3d 317, 319 (Pa. Super. 2011) (citing *Commonwealth v. Berry*, 877 A.2d 479, 482 (Pa. Super. 2005)). The PCRA court's findings will not be disturbed unless there is no support for the findings in the certified record. *Id*. (citing *Commonwealth v. Carr*, 768 A.2d 1164, 1166 (Pa. Super. 2001)). Where supported by the record, a PCRA court's credibility determinations are binding on a reviewing court. *Commonwealth v. Mitchell*, 105 A.3d 1257, 1277 (Pa. 2014) (citation omitted).

Both of Appellant's questions challenge trial counsel's representation. In order to succeed on a claim of ineffective assistance of counsel ("IAC"), an appellant must demonstrate (1) that the underlying claim is of arguable merit; (2) that counsel's performance lacked a reasonable basis; and (3) that the ineffectiveness of counsel caused the appellant prejudice. *Commonwealth v. Pierce*, 786 A.2d 203, 213 (Pa. 2001). "A failure to satisfy any prong of the ineffectiveness test requires rejection of the claim of ineffectiveness." *Commonwealth v. Daniels*, 963 A.2d 409, 419 (Pa. 2009) (citing *Commonwealth v. Sneed*, 899 A.2d 1067 (Pa. 2006)). We have explained that trial counsel cannot be deemed ineffective for failing to pursue a meritless claim. *Commonwealth v. Loner*, 836 A.2d 125, 132 (Pa. Super. 2003) (*en banc*). It is presumed that the petitioner's counsel was effective, unless the petitioner proves otherwise. *Commonwealth v. Williams*, 732 A.2d 1167, 1177 (Pa. 1999). We are bound by the PCRA court's credibility determinations where there is support for them in the record. *Commonwealth v. Battle*, 883 A.2d 641, 648 (Pa. Super. 2005) (citing *Commonwealth v. Abu-Jamal*, 720 A.2d 79 (Pa. 1998)).

With regard to the second IAC prong, we have reiterated that trial counsel's approach must be "so unreasonable that no competent lawyer would have chosen it." *Commonwealth v. Ervin*, 766 A.2d 859, 862-863 (Pa. Super. 2000) (quoting *Commonwealth v. Miller*, 431 A.2d 233 (Pa. 1981)). Our Supreme Court has long defined "reasonableness" as follows:

Our inquiry ceases and counsel's assistance is deemed constitutionally effective once we are able to conclude that the particular course chosen by counsel had *some reasonable* basis designed to effectuate his client's interests. The test is not whether other alternatives were more reasonable, employing a hindsight evaluation of the record. Although weigh the alternatives we must, the balance tips in favor of a finding of effective assistance as soon as it is determined that trial counsel's decision had any reasonable basis.

*Commonwealth v. Pierce*, 527 A.2d 973, 975 (Pa. 1987) (quoting

*Commonwealth ex rel. Washington v. Maroney*, 235 A.2d 349 (Pa.

1967)) (emphasis in original).

Appellant first claims that trial counsel was ineffective in hiring the

wrong medical expert. Appellant's Brief at 9. According to Appellant, "[a]

defense expert with specialized knowledge, like Dr. Patrick Barnes, could

have argued to the jury one of the many differential explanations for the

appearance of a subdural hematoma including accidents, prenatal

conditions, genetic conditions, metabolic disorders and infectious disease."

Appellant's Brief at 13 (footnote omitted). The Commonwealth responds

that trial counsel "exercised a reasonable defense strategy in retaining Dr.

Smith as the defense expert, but also managed to secure qualified experts

as resources for the defense at no cost." Commonwealth's Brief at 15.

The PCRA court recounted trial counsel's testimony regarding selection

of an expert as follows:

[Trial counsel] testified that he received full discovery from the District Attorney's Office in this case and his estimate was that the medical records were at least a banker box full of said records.

- 7 -

[Trial counsel] further testified that he went through all of the discovery materials that he had been provided and that he subsequently retained an expert for possible testimony at trial.

[Trial counsel] testified that while he was waiting for the complete discovery in this matter he began to approach and correspond with numerous experts to determine what their level of interest would be in testifying as an expert in the instant case.

[Trial counsel] testified that because the Commonwealth's expert was a doctor from UPMC that many doctors in the Pittsburgh area would not be willing to testify at trial.

[Trial counsel] then testified that he looked for a pediatric radiologist outside of the UPMC network but someone who was within a reasonable distance.

[Trial counsel] indicated that he had spoken with doctors from [The] Johns Hopkins [Hospital], Hershey, NYU and Ohio State, however they all wished to have a retainer of $10,000 upfront before they would begin looking at the records in this case.

Prior to [trial counsel] talking with the pediatric radiologists . . ., he indicated that he had hired a Dr. Smith who had testified in these types of cases in the past. Also, [trial counsel] testified that he had spoken to another doctor in the Pittsburgh area who was very familiar with "shaken baby syndrome." The name of that doctor would be Dr. [K]arl Williams and it was Dr. [K]arl Williams who suggested that [defense counsel] contact Dr. Smith as a possible expert witness in this case.

* * *

[Trial counsel] indicated that Dr. Smith then agreed to do a file review and said file review was done . . . .

[Trial counsel] testified that Dr. Smith was the Chief Medical Examiner of Beaver County and that when [trial counsel] asked Dr. Smith if he had handled any previous shaken baby cases, he had indicated that Dr. Smith had told him that he had handled several.

- 8 -

Also, [trial counsel] testified that it was important to him ([trial counsel]) that every time Dr. Smith had handled a case like the present case, the Commonwealth's witness was Dr. Janice Squire from UPMC Children's Hospital and this was the witness that the Commonwealth intended to call as an expert in their case-in-chief.

[Trial counsel] indicated that initially he was satisfied with Dr. Smith, however, as more medical records were delivered to [trial counsel] it was suggested to him [by Dr. Williams who was acting pro bono and Dr. Smith] that one Dr. Patrick Barnes should be consulted in this matter.

* * *

[Trial counsel] testified that because Dr. Barnes was a professional acquaintance of Dr. Williams, [the latter] contacted Dr. Barnes and Dr. Barnes agreed to review the medical records and write an opinion as to what he thought. At this time, Dr. Williams selected the necessary medical records from the banker's box and those records were mailed to Dr. Barnes. Dr. Barnes wrote a report and sent it back to [trial counsel].

* * *

[Trial counsel] testified that after he had reviewed Dr. Smith's report [he believed] that Dr. Smith had provided [trial counsel] and his client with a defense.

[Trial counsel] testified that he thought it was a good defense[;] however, for other reasons outside of that, it was a bad idea to go to trial but there was a defense that was a viable option in this case.

[Trial counsel] testified that Dr. Barnes had provided to him a report and that the conclusion of his report was that there were a series of diagnostic tests that need to have been performed to rule out other possible causes relative to the injury to the child. Some of those causes could have been genetic and it was possible that a certain genetic disorder may have caused the injury in question.

* * *

When [trial counsel] was asked by the [PCRA] court [whether] one of the biggest problems that he would face as a defense attorney in the instant case was the fact that [Appellant] made a statement saying that he was in sole custody of the child and that the mother had related that when the child was placed in [Appellant's] custody, the child was perfectly fine and when the mother had returned home, the child was in a very damaged condition. [Trial counsel] answered that question by indicating that the Court's question was 100% accurate. [Trial counsel] testified that he filed motions to try to keep that type of information out[;] however motions filed by [trial counsel] were denied by the [trial court]. [Trial counsel] further testified that [Appellant] had made admissions in Children's Hospital which Detective Weaver had put in his report. When asked by counsel for [Appellant] if it was [of] utmost importance in this case to hire the right expert, [trial counsel] answered by saying that he believed he did have the correct expert.

[Trial counsel] testified that he did go to Judge Hathaway for a second expert and had requested that Judge Hathaway . . . hire Dr. Barnes. [Trial counsel] testified that there was a hearing held before Judge Hathaway and that after hearing on the matter, [Judge Hathaway] felt that Dr. Smith first of all was more competent to testify and second, she indicated that there was not any more money available for experts in this case.

[Trial counsel] was asked why he did not hire Dr. Barnes as his expert first and [trial counsel] responded by saying that he was not aware of Dr. Barnes until he had already hired Dr. Smith and had consulted with Dr. Williams.

PCRA Court Opinion, 5/24/14, at 11–14. Based on trial counsel's testimony,

the PCRA court concluded as follows:

The Court finds [trial counsel's] testimony credible and encompassing as to the efforts he made in representing [Appellant].

* * *

It is clear from the record that [trial counsel] spent a great deal of time discussing the medical records and a possible defense with his client between the time of the Preliminary

- 10 -

Hearing and the time that the case was called to trial at which time a plea of guilty was entered by [Appellant].

* * *

At the date set for trial [trial counsel] faced an extremely difficult and complicated situation. [Trial counsel] had a client who maintained that he had not injured the infant child in any manner, however, there was scientific evidence to be presented by the Commonwealth that showed that [Appellant] was the sole custodian of the child in question when the child received massive traumatic brain injuries. Also, [trial counsel] knew that his client has made additional inculpatory statements to Detective Weaver and that his client could face an extremely long period of time of incarceration if he were convicted of the crimes facing him in this case. . . .

In reviewing this case, this Court finds that every effort that [trial counsel] made in this case was designed to effectuate the best interest of [his] client. [Trial counsel] requested and received discovery, he attempted to find various medical experts that would be a benefit to his client in this matter and in fact he located two (2) doctors who had experience in "shaken baby syndrome" cases and had retained one of those doctors to testify at trial. Further, [trial counsel] had a second doctor advising him about a possible defense in this matter. [Trial counsel] also attempted to receive additional funds from the Court of Westmoreland County through The Honorable Rita D. Hathaway and after a hearing she determined that Westmoreland County was not in a position to pay additional monies for additional experts in this matter.

In reading the records it becomes clear to this Court that [trial counsel] did everything possible that he could as a defense attorney to protect the best interests of [Appellant] in this case.

* * *

In point of fact, this Court finds that the handling of [Appellant's] case by [trial counsel] was exemplary because he had taken every possible step necessary to protect the best interests of his client[.]

*Id.* at 17, 18, 20, 21.

Our review of the record reveals significant support for the PCRA court's determination and leads us to conclude that the PCRA court's determination is free of legal error. Trial counsel consulted with three physicians, all notably employed and experienced with shaken baby cases. Dr. Williams provided *pro bono* assistance in the form of consultations and recommendations. N.T. (PCRA), 2/27/14, at 15–16, 51. Trial counsel learned about Dr. Smith from Dr. Williams four or five months after the preliminary hearing. Dr. Smith reviewed the medical records, provided a written report, and was prepared to testify as an expert at trial. *Id.* at 12–13, 17–18. Trial counsel learned about Dr. Barnes six to eight months after he had hired Dr. Smith. Dr. Barnes provided *pro bono* assistance in the form of consultations, a review of medical records, and a report. *Id.* at 15, 18–19, 21. Although trial counsel requested funds to hire Dr. Barnes, Judge Hathaway denied the request because Dr. Smith could provide a good defense and because no funds were available for a second expert. N.T. (Motion), 4/23/12, at 20.[3] Moreover, trial counsel testified that, if Appellant had gone to trial, Dr. Barnes would have been the preferred expert, but Dr. Smith's testimony was a "viable option." N.T. (PCRA), 2/27/14, at 20–21.

---

[3] According to Judge Hathaway, trial counsel could not be deemed ineffective because he, in fact, requested a second medical expert, but she exercised her discretion in refusing that request. N.T., 4/23/12, at 19.

The PCRA court deemed trial counsel's testimony credible, and we may not disturb that credibility determination because it is supported by the record. PCRA Court Opinion, 5/24/14, at 17; **Mitchell**, 105 A.3d at 1277. Based on trial counsel's testimony, we discern nothing in the record even remotely suggesting that trial counsel's approach was "so unreasonable that no competent lawyer would have chosen it." **Ervin**, 766 A.2d at 862-863. Given his training and experience as a forensic pathologist and his familiarity with the Commonwealth's expert, who also is a forensic pathologist, Dr. Smith was qualified to provide expert testimony regarding S.T.'s injuries and differential causes. Moreover, Dr. Smith would have access to Dr. Barnes' report in formulating his opinions and presenting testimony to the jury. Thus, we affirm the PCRA court's determination that trial counsel was not ineffective in hiring Dr. Smith as a medical expert.

Appellant's second IAC claim is that trial counsel advised him to plead guilty even though the Commonwealth failed to provide a sufficient factual basis for the *mens rea* element of the aggravated assault charge. Appellant's Brief at 16, 20. Contrarily, the Commonwealth relies on Appellant's trial preparation with counsel and the testimony of Ms. Keppler and Detective Weaver to demonstrate that Appellant was fully aware of the facts surrounding S.T.'s injury when he pled guilty to aggravated assault. Commonwealth's Brief at 17, 20.

The right to the constitutionally effective assistance of counsel extends to counsel's role in guiding his client with regard to the consequences of entering into a guilty plea.

Allegations of ineffectiveness in connection with the entry of a guilty plea will serve as a basis for relief only if the ineffectiveness caused the defendant to enter an involuntary or unknowing plea. Where the defendant enters his plea on the advice of counsel, the voluntariness of the plea depends on whether counsel's advice was within the range of competence demanded of attorneys in criminal cases.

Thus, to establish prejudice, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial. The reasonable probability test is not a stringent one; it merely refers to a probability sufficient to undermine confidence in the outcome.

*Commonwealth v. Barndt*, 74 A.3d 185, 192 (Pa. Super. 2013) (internal

quotation marks and citations omitted).

A factual basis for the plea means:

the facts acknowledged by the defendant constitute a prohibited offense. This salutary requirement is to prevent a plea where in fact the legal requirements have not been met; and, to name and define the offense, supported by the acts, so the defendant will know the legal nature of the guilt to which he wishes to plead.

*Commonwealth v. Fluharty*, 632 A.2d 312, 314 (Pa. Super. 1993)

(quoting *Commonwealth v. Anthony*, 475 A.2d 1303, 1307 (Pa. 1984)

(footnote omitted)).

Here, Appellant challenges the factual basis for the offense of

aggravated assault, which is defined as follows:  "A person is guilty of

aggravated assault if he attempts to cause serious bodily injury to another

or causes such injury intentionally, knowingly or recklessly under the circumstances manifesting extreme indifference to the value of human life. 18 Pa.C.S.A. § 2702(a)(1)." *Commonwealth v. Smith*, 956 A.2d 1029, 1036 (Pa. Super. 2008).

> A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and intent of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation.

18 Pa.C.S. § 302(b)(3). "The circumstances showing intent to cause serious bodily injury apply with equal force to prove recklessness to a degree that one would reasonably anticipate serious bodily injury as a likely and logical result." *Smith*, 956 A.2d at 1037 (citing *Commonwealth v. Bruce*, 916 A.2d 657, 663–664 (Pa. Super. 2007)). "Direct proof of [an a]ppellant's subjective thought process is unnecessary, because the Commonwealth may prove its case through circumstantial evidence." *Id.* at 1037–1038 (citation omitted).

The trial court expressly relied on the testimony of Detective Weaver and Ms. Keppler "to form a factual basis for the entrance of the guilty plea in this matter." N.T. (Plea), 6/5/12, at 40. In response to the prosecutor's questioning, Ms. Keppler answered affirmatively that Appellant caused serious bodily injury to S.T.; that S.T. did not have any physical or mental problems prior to this incident; that S.T. cannot eat or move by herself, and

she cannot speak; that Appellant endangered S.T.'s welfare by inflicting serious bodily injury to S.T.; that Appellant acted knowingly or recklessly when he inflicted the trauma upon S.T., but not intentionally as far as the consequences of the injuries to S.T.. *Id.* at 8–13.

Detective Weaver testified as follows:

Well, my investigation began at Children's Hospital where [S.T.] had been taken. I then interviewed the emergency room doctor at Conemaugh Hospital. I interviewed the pediatrician to ascertain if there [were] any preexisting conditions. The ER doctor at Conemaugh told me he felt it was a child abuse case.

Then when the child was at Children's, they ran the tests, and due to the findings they found, they agreed that it was a physical trauma case, an abuse case, shaken baby case.

I interviewed the mom, her aunt, another lady that was with them on the day that this happened, September 21st of 2009. Basically the information I had was about noon they left [Appellant] with [S.T.] and when they left, [S.T.] was finishing up a bottle. [Appellant] was holding her. And they were taking [Ms. Keppler's] sister back to the airport to fly back home. They didn't return home until about 4:00 in the afternoon. When they returned home, [S.T.] was limp. She was unresponsive. And at that point they took her to the emergency room at Conemaugh.

And then the diagnosis began. And due to the fact that from the information I received from Children's Hospital that the doctor said that if [S.T.] was drinking a bottle at noon, this injury had not occurred yet because she wouldn't have been able to drink a bottle because it was such a severe injury.

And both [Appellant's] statement and the statement of [Ms. Keppler], [that] he was feeding her a bottle when they left [indicate that] . . . she was able to drink the bottle. The doctor advised me that . . . the fact they came home at four and she was in an unresponsive condition, and the fact that [Appellant] told me that he was alone with the baby from noon to four, no one else was there, based on these facts I filed the criminal charges.

- 16 -

* * *

The medical people did not advise me of any preexisting conditions.

* * *

[Appellant] said that he was alone with the baby sitting on the couch in the living room. He said that he had finished giving [S.T.] her bottle and burped her. Laid down on the couch with [S.T.] on top of him laying [sic] on his chest. The baby fell asleep and [Appellant] put her in the rocker. About 3:00 p.m. she woke up fussy. He changed her diaper and she was still fussy. Then he tried to feed her and she was still fussy. [Appellant] said that he then put her on his lap and she was laying [sic] on her back with her head at his knees and her feet at his waist. He said that he plays a game with her and would pump her arms up and down and say "choo choo". He said that he started doing this.

At this point of the interview he began to cry and said, I just wanted to wake her up. I was freaking out. He said that he grabbed her by her forearms and shook her while she was on his lap. He was just trying to wake her up. [Appellant] said first that he shook her too hard, then he said he might have shaken her too hard. And then I asked him if her head was moving back and forth, and he said, a little but not a lot. He said he never picked her up and shook her. He said, I was doing "choo choo," and it was probably too hard.

N.T. (Plea), 6/5/12, at 18–19, 47–48.

Although the PCRA court did not specifically address Appellant's second IAC claim in its decision, it concluded that counsel "did everything possible that he could as a defense attorney to protect the best interests of [Appellant]" and "it did everything possible to protect the rights of [Appellant] and make sure his plea of guilty was freely, knowingly,

intelligently, and voluntarily made."  PCRA Court Opinion, 5/24/14, at 20. We agree.

Detective Weaver's and Ms. Keppler's testimony, along with Appellant's incriminating statements, provide a sufficient factual basis to support the *mens rea* element of aggravated assault—that Appellant acted knowingly or recklessly when he played a game of "choo choo" with his three-week-old daughter that, by his own admission, was "too hard."  N.T. (Plea), 6/5/12, at 8–13, 18–19, 47–48.  Appellant consciously disregarded a substantial and unjustifiable risk that his conduct would result in serious bodily injury to S.T.  Thus, because Appellant's underlying claim of an insufficient factual basis lacks merit, we conclude that counsel was not ineffective in advising Appellant to enter a guilty plea to the charge of aggravated assault.

Order affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date:  4/10/2015