J-A10042-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| CHESTER VERNON ROBERTS | |
| Appellant | No. 1278 MDA 2014 |

Appeal from the Judgment of Sentence June 26, 2014
In the Court of Common Pleas of Huntingdon County
Criminal Division at No(s): CP-31-CR-0000353-2012

BEFORE:  GANTMAN, P.J., MUNDY, J., and JENKINS, J.

MEMORANDUM BY JENKINS, J.:                    **FILED APRIL 17, 2015**

Chester Vernon Roberts files this direct appeal from his judgment of sentence for rape by forcible compulsion.[1] We affirm.

The relevant procedural history is as follows.  On August 3, 2011, the police filed a criminal complaint charging Roberts with rape and other offenses.[2]  Roberts was not arrested until June 25, 2012.  On January 4, 2013, Roberts filed a motion to dismiss under Pa.R.Crim.P. 600.  Following a hearing, the trial court denied the Rule 600 motion.  On November 13-14, 2013, the case proceeded to trial.  A jury found Roberts guilty of rape, and the trial court sentenced Roberts to 77-240 months' imprisonment, a fine of

_____

[1] 18 Pa.C.S. § 3121(a)(1).

[2] All charges other than rape by forcible compulsion were dismissed before trial.

$1,000.00 and restitution in the amount of $750.00. Roberts filed timely post-sentence motions, all of which the trial court denied except for a motion to modify Roberts' sentence. On June 26, 2014, the trial court re-sentenced Roberts to the same terms of imprisonment and restitution but removed his fine. Roberts filed a timely notice of appeal, and both Roberts and the trial court complied with Pa.R.A.P. 1925.

The trial court summarized the evidence against Roberts as follows:

> [Roberts], who is 32 years of age, testified that he spent the evening of May 25, 2011, drinking beer at the Friendly Tavern in downtown Huntingdon. He was at the time separated from his girlfriend, Jerrica Spell, the half-sister of [S.M.], the victim in this case. [Roberts] left the Friendly around 11:00 and walked several blocks to his sister's residence where he planned to spend the night. He said he was 'buzzed' but not drunk and his intention was to sleep a couple hours before meeting his brother to go to Williamsport to do a roofing job. At his sister's he reported changing into his work clothes and then laying down on a bed.
>
> At 12:02 a.m., May 26 [] Roberts texted [S.M.] 'what's up'. At 12:03 [S.M.] responded 'not much why?'. [Roberts] answered 'my cousin, Kenny, wants to meet you, I told him about you and don't tell Zack.' [S.M.], who was 19 years of age on the date of the incident, lived with her boyfriend, Zack Hydrick, several blocks from [Roberts]'s sister's residence. She testified that she knew [Roberts] since she and her sister, Jerrica, were very close and 'hung out' every day with Jerrica's baby. She said that while she didn't like Vernon, she had no reason not to trust him and that's why she responded to his text which she admitted she found weird.
>
> At 12:06 [S.M.] texted 'who is your cousin, Kenny, and why does he wanna meet me lol'. [Roberts]

- 2 -

answered at 12:09 'he is cool and if you want to meet him tell Zack you have to walk somewhere and meet us in the alley from where you live, trust me you will like him'. [S.M.] decided to go out and see what was going on. She told her boyfriend what she was doing and they agreed to keep in contact. She was wearing, she said, a blue tank top, a pair of jean shorts and flip-flops. She had a messenger bag.

Outside she found [Roberts] waiting and the two started walking in the direction of the J. C. Blair Hospital since [Roberts] had told her that Kenny lived near the hospital. At 12:33 [S.M.] texted Zack 'Everything seems okay … I'll text you.' At the intersection of 12th Street and Warm Springs Avenue there is a path that leads to houses near the top of a hill that is adjacent to the hospital. [Roberts], [S.M.] said, told her that his cousin lived in one of the houses and [S.M.] testified she could see lights on in one of the houses. They started up the path and [S.M.] indicated it was dark in a text to Zack. She testified that the path was kind of paved and then it stopped and started getting rough with leaves and stuff. She said she questioned [Roberts] as to whether or not there was a front way up to the house. She said she started to turn around to go back down the path when [Roberts] grabbed her from behind and pushed her onto the ground. She tried to stand up, she said, when he grabbed her around the face. She grabbed his free hand and testified there was something in it. At first she said she didn't know what the object was so she held on. The object was a knife and she asked him what he was going to do. He told her, she said, that if she yelled he would stick her. She promised not to yell and he loosened his grasp and pulled the knife out of her hand. Although, [S.M.] said, she never saw the instrument, she is certain it was a knife because her hand was cut.

[Roberts] started pulling her shorts off and kept telling her he had always wanted her. Her glasses got knocked off and she said she was in shock. It was a grassy area she said, but [Roberts] was

unsuccessful in getting her clothes off. She lost an earring but eventually stood up and managed to go back down the hill a couple steps toward the streets. She was however pulled down again, she said, and this time he was able to pull her pants off. He turned her around, she said, and attempted anal sex with no success. He turned her around again and made her touch him which made it possible for him to have vaginal intercourse with her. She didn't know, she said, if he had a condom and she could not say if he ejaculated inside her. He penetrated her, she said, three (3) or four (4) times over a thirty (30) second period. The area where the actual intercourse occurred, she testified, was leaf covered.

[Roberts] stood up then and got dressed. He couldn't find his phone. [S.M.] said she tried to act normal and with the use of her cell phone helped him find his. Her phone, she said, started ringing and she answered. It was Zack calling and she did not tell him what had just happened. They walked out and with the benefit of street lights she saw her hand was bleeding. He was wearing dark jeans, sneakers and a grey sweatshirt, she said. Also, she said, he was wearing work gloves.

At home she told Zack what had happened. At 1:16 [Roberts] texted her 'I am sorry please believe me on Nevaeh['s] life'. Nevaeh is the baby [Roberts] and Jerrica have together. [S.M.] responded at 1:19 'IDK.' At 1:23 [Roberts] texted 'Please don't hate me will you text me tomorrow'. Curiously at 1:24 [S.M.] texted 'Yes' to which at 1:25 [Roberts] responded 'Do you hate me'.

[S.M.] and Zack then went to her mother's home and from there to the J.C. Blair Hospital where they arrived at 1:45 a.m. At 2:04 ER staff at the hospital notified the Huntingdon Borough Police. The hospital records indicated that [S.M.] presented 'tearful, covered in dirt, leaves in hair. No shoes. Blood on clothing and holding blood covered paper towels in left hand'. [S.M.]'s statement to the ER personnel as

to what happened was remarkably consistent with her testimony at trial.

Ms. Stephanie Stratton, a sexual assault nurse examiner, testified she was called from home to do an evaluation. She arrived at the hospital at 2:50 to do her examination which she allowed is quite intrusive.

Nurse Stratton reported that [S.M.] was physically, visibly upset, crying, disheveled. She had leaves, she said, and bruises and abrasions on her body. In this regard, she noted on her report that above her right eye she had redness and an abrasion and laceration. Also, the nurse documented a laceration to the bottom lip and that the patient was complaining that her jaw was sore. A bruise on her right arm and left elbow was charted and, according to the nurse, both breasts had abrasions and lacerations. Nurse Stratton testified she saw and documented a right bruise on her lower leg as well as abrasions and lacerations to the left leg. Both knees, she said, were red and bruised. Finally, Ms. Stratton reported that the left hand of [S.M.] had been sutured by Dr. Delp, the ER doctor that evening.

As noted, the Huntingdon Borough Police became involved at 2:04 a.m. Cpl. John Stevens, a twenty-eight (28) year veteran of the department, testified that he secured the scene of the incident at 3:11 a.m. The Pennsylvania State Police were notified and a trooper who specializes in forensically collecting evidence and diagraming scenes was sent to assist the Huntingdon Borough Police. The scene, he said, was divided into two (2) areas. Cpl. Stevens described the first area as grassy and with a slight slope uphill. Cpl. Stevens reported that three (3) items of evidence were recovered in this area. They were a condom, an earring and grass with possible bloodstains. The second area that was identified and marked on a map was near a retaining wall and was covered with leaves. In that area Stevens said they recovered a glove, a flip-flop shoe, a belt, a condom

wrapper, a tampon and leaves with possible blood on them.

Officer Shannon Gummo, the prosecutor in the case, testified and indicated she met the victim at the J. C. Blair Hospital, and took a brief statement. The following day, she said, [S.M.] came to the station and provided a twelve (12) page written statement. Officer Gummo also testified that she participated in taking a statement from [Roberts] on May 26 at the police offices. Present were an assistant district attorney, the chief public defender, Chief of Police Rufus Brenneman, [Roberts] and Officer Gummo. The process began at 10:00 a.m. and was tape recorded. Without objection, the taped statement was played at trial. In it [Roberts] admitted sex with [S.M.] and the fact that he lured her out of her house with a bogus story about his cousin, Kenny. But, he was adamant that the sex was consensual and equally certain that he had no knife.

Sara Harner, an employee of the Pennsylvania State Police, testified and was accepted as an expert in DNA analysis. She expressed an opinion that blood found on the glove recovered at the scene matched the DNA profile of [S.M.]. [Roberts] testified and his testimony dovetailed in most respects to his taped statement taken May 26, 2011. He acknowledged that he initiated contact with [S.M.] that morning and that he fabricated as a reason for meeting a desire on the part of his cousin, Kenny, to meet [S.M.]. He testified however that [S.M.] was a willing partner that morning and that he in no way forced her to have sex. He said he had no knife and saw no blood. Nor did she, according to [Roberts], complain of any injury. He allowed that there was a possibility he had work gloves in his back pocket that early morning, but, he said, he didn't wear a glove. He explained his text messages after the sex as guilt and the fact he didn't want [S.M.] mad at him.

On these facts, the jury convicted [Roberts] of the crime of rape.

Memorandum Sur Roberts' Motion For Post-Sentence Relief, June 5, 2014, pp. 2-10 (incorporated by reference into Pa.R.A.P. 1925(a) opinion).

Roberts raises three issues in this appeal:

> Did the trial court err in denying [Roberts'] Motion to Dismiss per Pa.R.Crim.P. 600?
>
> Did the trial court err in denying [Roberts'] Motion For Judgment of Acquittal based on the insufficiency of the evidence in establishing each and every element of the charge of Rape - Forcible Compulsion?
>
> Did the trial court err in denying [Roberts'] Motion in Arrest of Judgment and For a New Trial in that the weight of the evidence did not support the guilty verdict as to the charge of Rape - Forcible Compulsion?

Brief for Appellant, p. 6.

Roberts first argues that the trial court erred in denying his pretrial motion to dismiss the rape charge against him under Pa.R.Crim.P. 600, Pennsylvania's speedy trial rule. We disagree.

Our standard and scope of review in evaluating Rule 600 claims are well-settled:

> 'Our standard of review in evaluating Rule 600 issues is whether the trial court abused its discretion …' 'The proper scope of review in determining the propriety of the trial court's ruling is limited to the evidence on the record of the Rule [600] evidentiary hearing and the findings of the lower court. In reviewing the determination of the hearing court, an appellate court must view the facts in the light most favorable to the prevailing party.'

*Commonwealth v. Matis*, 710 A.2d 12, 15 (Pa.1998); *Commonwealth v. Bowes*, 839 A.2d 422, 424 (Pa.Super.2003).

A speedy trial analysis typically involves a two-step inquiry: "(1) whether the delay violated [Rule 600]; and, if not, then (2) whether the delay violated the defendant's right to a speedy trial guaranteed by the Sixth Amendment to the United States Constitution and by Article I, Section 9 of the Pennsylvania Constitution." *Commonwealth v. DeBlase*, 665 A.2d 427, 431 (Pa.1995). Where the first inquiry is answered in the affirmative, or where the constitutional dimension of a speedy trial issue is not raised (as is the case, here), there is no need to engage in the latter. *Id*.

Rule 600 provides in relevant part:

(**A**)(2)(a) Trial in a court case in which a written complaint is filed against the defendant, when the defendant is at liberty on bail, shall commence no later than 365 days from the date on which the complaint is filed.

...

(**B**) For the purpose of this rule, trial shall be deemed to commence on the date the trial judge calls the case to trial, or the defendant tenders a plea of guilty or *nolo contendere.*

(**C**) In determining the period for commencement of trial, there shall be excluded therefrom:

(1) the period of time between the filing of the written complaint and the defendant's arrest, provided that the defendant could not be apprehended because his or her whereabouts were unknown and could not be determined by due diligence;

(2) any period of time for which the defendant expressly waives Rule 600;

(3) such period of delay at any stage of the proceedings as results from:

(a) the unavailability of the defendant or the defendant's attorney;

(b) any continuance granted at the request of the defendant or the defendant's attorney.

*Id*. There is a three-step process for determining whether there has been a Rule 600 violation. *Commonwealth v. Ramos*, 936 A.2d 1097, 1103 (Pa.Super.2007) (en banc). The first step is to determine the mechanical run date, i.e., the 365th day after the filing of the criminal complaint. *Id*. The second step is determining the amount of excludable and excusable delay. *Id*. Excludable delay includes any delay attributable to defendant or his counsel. Pa.R.Crim.P. 600(c)(3)(a); *Commonwealth v. Dixon*, 907 A.2d 468, 474 (Pa.2006) (any delay attributable to defendant's requests or conduct is excludable from 365-day period in which trial must commence). Excusable delay is delay that occurs as a result of circumstances beyond the Commonwealth's control and despite its due diligence. *Ramos*, 936 A.2d at 1103. Periods of delay which are attributable to court congestion constitute excusable delay. *Commonwealth v. Frye*, 909 A.2d 853, 859 (Pa.Super.2006).

The third step is adding excludable and excusable delay to the mechanical run date to arrive at an adjusted run date. *Ramos*, 936 A.2d at

1103. A Rule 600 violation occurs if trial does not begin before the adjusted run date. *Id*.

Here, on August 3, 2011, the police filed a criminal complaint against Roberts. Trial commenced on November 13, 2013, 866 days later. The record demonstrates, however, that there were 522 days of excludable and excusable time. As a result, the adjusted run date was later than November 13, 2013, and Roberts' trial was timely under Rule 600.

In chronological order, there were four periods of excludable and excusable time:

**1.** *327 day delay between the filing of the complaint, August 3, 2011, to the date of Roberts' arrest, June 25, 2012.* The period of time between the filing of the complaint and the defendant's arrest is excludable, provided that the defendant could not be apprehended because his or her whereabouts were unknown and could not be determined by due diligence. Comment, Pa.R.Crim.P. 600. "Due diligence" in this context is "fact-specific, to be determined case-by-case; it does not require perfect vigilance and punctilious care, but merely a showing the Commonwealth has put forth a reasonable effort." ***Commonwealth v. Selenski***, 994 A.2d 1083, 1089 (Pa.2010). To determine whether the police acted with due diligence, the court employs a balancing test where,

> using a common sense approach, [it] examines the activities of the police and balances this against the interest of the accused in receiving a fair trial. The actions must be judged by what was done, not by

- 10 -

what was not done. The efforts need only be reasonable; lack of due diligence should not be found simply because other options were available or, in hindsight, would have been more productive.

*Commonwealth v. Ingram*, 591 A.2d 734, 737 (Pa.Super.1991) (internal citations omitted). In other words, "it is simply not required that the Commonwealth exhaust every conceivable method of locating a defendant. Rather, reasonable steps must be taken." *Commonwealth v. Jones*, 389 A.2d 1167, 1170 (Pa.Super.1978).

The police exercised due diligence in their attempts to locate Roberts following the filing of the criminal complaint. Officer Shannon Gummo of the Huntingdon Borough Police Department attempted numerous times to contact Mary Bumgardner, mother of Roberts' paramour. N.T. 1/13/13, at 8. Officer Gummo also (1) contacted the Lewistown Police Department in neighboring Mifflin County based upon a tip that Roberts was residing with an acquaintance in that jurisdiction, *Id*.; (2) contacted the Mount Union Police Department in Huntingdon County and the State Police, *Id*. at 9, 12; (3) contacted Roberts' sister on several occasions, *Id*. at 9; (4) checked job sites of Roberts' employer to see if Roberts was present, *Id*.; and (5) entered Roberts' name into the NCIC system, as well as what is known as the BOLO ("Be On Look Out") system, *Id*. at 11-12. Trooper Eric Glunt of the Pennsylvania State Police and his colleagues went to the residence of Roberts' relative, where he was believed to be staying. *Id*. at 20. They found indicia of Roberts' occupancy, but Roberts was not present. *Id*. They

returned to that address one other time but to no avail, and they looked for Roberts at his mother's residence on two occasions. *Id*. Trooper Glunt also (1) spoke to neighbors of Roberts' mother, who said they had not seen Roberts at that address, *Id*.; (2) investigated another address at which Roberts was reported to be residing, *Id*.; (3) repeatedly checked the address of Roberts' paramour, *Id*.; and (4) went to another location on information from the FBI that Roberts had applied for assistance benefits using that address. *Id*. at 22. Finally, Trooper Glunt went to the post office and discovered that Roberts had his mail forwarded to his sister's address. *Id*. at 23. Trooper Glunt searched his sister's residence without success. *Id*. Trooper Glunt estimated that he attempted to serve the arrest warrant for Roberts eight or nine times. *Id*. at 24.

These efforts to apprehend Roberts were at least as diligent as efforts that we have found adequate in other speedy trial cases. *See Commonwealth v. Gratkowski*, 430 A.2d 998, 1000 (Pa.Super.1981) (Commonwealth acted with due diligence in locating and arresting defendant, where police attempted to locate defendant at his last known address, recurrently asked about him at restaurant where he was last known to be employed, and contacted other police agencies concerning his whereabouts); *Commonwealth v. Laurie*, 483 A.2d 890, 892 (Pa.Super.1987) (Commonwealth acted with due diligence where police made only one telephone call to defendant's last known address, contacted

his family and Department of Welfare, placed an advertisement in local newspaper containing his photograph and description, and entered his name into national and local crime databases).

**2.** *14 day delay due to defense counsel's request for continuance*. After Roberts' arrest, defense counsel requested and obtained a continuance of the preliminary hearing from July 3, 2012 to July 17, 2012, a period of fourteen days. This delay was excludable under Rule 600. **Commonwealth v. Jones**, 886 A.2d 689, 701 (Pa. Super. 2005) (delay of 80 days between date of defendant's originally-scheduled preliminary hearing and date of rescheduled preliminary hearing, resulting from defense counsel's requests for two continuances, was excludable).

**3.** *125 day delay due to Roberts' pretrial motion to dismiss under Rule 600*. The docket demonstrates that the court originally scheduled trial for January 7, 2013, but due to Roberts' pretrial motion to dismiss under Rule 600, the court continued trial until March 4, 2013. On January 31, 2013, the court held a hearing on the Rule 600 motion. After the hearing, the court rescheduled trial for March 20, 2013. On March 2, 2013, the court again continued trial until May 6, 2013. On March 13, 2013, the court denied Roberts' Rule 600 motion.

The period of 69 days from the filing of the Rule 600 motion on January 4, 2013 until its denial on March 13, 2013 is excludable time. **Commonwealth v. Hyland**, 875 A.2d 1175, 1191 (Pa.Super.2005) (time

between filing of defendant's Rule 600 motion and court's denial of motion was excludable). The 56 day delay from the denial of the Rule 600 motion on March 13, 2013 to the next available jury selection date of May 6, 2013 was excusable as well. ***Commonwealth v. Frye***, 909 A.2d 853, 859 (Pa.Super.2006) (delay resulting from court congestion constitutes excusable delay).

**4.** *56 day delay due to Roberts' motion for funds to hire an expert and motion for continuance.* On April 29, 2013, one week before the scheduled trial date of May 6, 2013, Roberts filed a motion for funds with which to hire an expert in DNA analysis and a motion for continuance. The court granted the motions and continued trial until July 1, 2013, 56 days after May 6th. This delay was excludable under Rule 600. ***Jones***, 886 A.2d at 701.

These four periods of excludable or excusable delay total 522 days. Only 344 of the 866 days of delay are chargeable to the Commonwealth, within Rule 600's boundary of 365 days. Thus, the trial court properly denied Roberts' Rule 600 motion.

In his second argument on appeal, Roberts challenges the sufficiency of the Commonwealth's evidence with regard to his conviction for rape by forcible compulsion. Roberts insists that the evidence demonstrates that he had consensual intercourse with S.M. We disagree.

Our standard of review for challenges to the sufficiency of the evidence is well-settled:

> [W]hether[,] viewing all the evidence admitted at trial in the light most favorable to the [Commonwealth as the] verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying [the above] test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence.

*Commonwealth v. Troy*, 832 A.2d 1089, 1092 (Pa.Super.2003) (citations omitted).

The crime of rape by forcible compulsion has three elements: (1) the defendant engaged in sexual intercourse with the complainant; (2) the defendant procured intercourse by using force or the threat of force; and (3) intent. 18 Pa.C.S. § 3121. "[P]enetration, however slight," of the female genitals with the penis is necessary to establish the element of sexual intercourse. 18 Pa.C.S. § 3101. A victim's testimony, even uncorroborated, as to penetration is sufficient to establish the element of "sexual intercourse". *Commonwealth v. Wall*, 953 A.2d 581, 584 (Pa.Super.2008). "Forcible compulsion" means "something more" than mere lack of consent. **Commonwealth v. Smolko**, 666 A.2d 672, 676 (Pa.Super.1995). "Where there is a lack of consent, but no showing of either physical force, a threat of

physical force, or psychological coercion, the 'forcible compulsion' requirement … is not met." *Id.* Finally, intent may be inferred from the actions and of the defendant in light of all the attendant circumstances. ***Commonwealth v. Chance***, 458 A.2d 1371, 1374 (Pa.Super.1983).

Construed in the light most favorable to the Commonwealth, S.M.'s testimony establishes all of these elements. She testified that Roberts grabbed her from behind, pushed her to the ground and told her to "get down". N.T. 11/13/2013 at 165. When she tried to get back up, Roberts tried to hold her down and grabbed her around the face and neck. *Id*. S.M. testified she thought Roberts was going to try to suffocate her, so she grabbed Roberts's other hand. *Id*. In that hand, the victim felt what she realized was a knife; the knife cut her hand. *Id*. Roberts told the victim that if she yelled, he would "stick" her. *Id*. at 167. He started pulling S.M.'s shorts off, and S.M. said she "didn't want to do this." *Id*. at 168. She was able to stand up, pull her shorts up, and move a few steps away before Roberts again pushed her to the ground. *Id*. at 171. Roberts pulled the victim's shorts off, pulled his pants down and penetrated her vagina with his penis "three or four" times for about "30 seconds" altogether. *Id*. at 172, 174. These facts are sufficient to establish the "forcible compulsion", "sexual intercourse" and "intent" elements of the crime of rape.

In his third and final argument, Roberts challenges the weight of the evidence adduced during trial. The law pertaining to weight of the evidence

claims is well-settled. The weight of the evidence is a matter exclusively for the finder of fact, who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. *Commonwealth v. Forbes*, 867 A.2d 1268, 1273–74 (Pa.Super.2005). A new trial is not warranted because of "a mere conflict in the testimony" and must have a stronger foundation than a reassessment of the credibility of witnesses. *Commonwealth v. Bruce*, 916 A.2d 657, 665 (Pa.Super.2007). Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice. *Id.*

On appeal, "our purview is extremely limited and is confined to whether the trial court abused its discretion in finding that the jury verdict did not shock its conscience. Thus, appellate review of a weight claim consists of a review of the trial court's exercise of discretion, not a review of the underlying question of whether the verdict is against the weight of the evidence." *Commonwealth v. Knox*, 50 A.3d 732, 738 (Pa.Super.2012). An appellate court may not reverse a verdict unless it is so contrary to the evidence as to shock one's sense of justice. *Forbes*, 867 A.2d at 1273–74.

Roberts contends that several facts demonstrate that the verdict was against the weight of the evidence. He claims: (1) S.M. left her home and boyfriend at midnight after a call from Roberts, her sister's ex-boyfriend, and readily agreed to take a walk with him; (2) Roberts and S.M. walked to

a dark nearby area, while she texted her boyfriend to make sure he was still back at their house; (3) S.M. had her cellphone in her hand throughout the entire incident, stated that she could text without looking at the keyboard, and did not call for help from her boyfriend, police, or family members during or after the incident; (4) although the site of the sexual encounter was within close proximity to six houses and the emergency room entrance for J.C. Blair Memorial Hospital, S.M. did not try to call for help or run away to these buildings; (5) after the sexual encounter, S.M. took a phone call from her boyfriend and fabricated a story as to why she was still out with Roberts; and (6) the knife found at the scene of the sexual encounter belonged to the alleged victim, given the testimony of S.M.'s sister that S.M. owned and used knives and even practiced self-cutting, so S.M. most likely cut herself on her own knife instead of being cut by Roberts.

While this evidence might have facilitated a spirited defense, we cannot say that it warrants a new trial. This case boiled down to the credibility of S.M. and Roberts. Both sides had full and fair opportunity to present their versions of events to the jury, but the jury had the final say on their credibility. The jury chose to believe S.M. and find Roberts guilty. Based on the cold record, we find that the trial court acted within its discretion by concluding that the verdict did not shock its conscience.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>4/17/2015</u>