J-S29028-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | |
| WARREN STOKES | |
| Appellant | No. 1861 EDA 2016 |

Appeal from the Judgment of Sentence dated April 29, 2016
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0002680-2015

BEFORE: LAZARUS, J., SOLANO, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY SOLANO, J.:                    **FILED JULY 12, 2017**

Appellant, Warren Stokes, appeals from the judgment of sentence imposed after a jury convicted him of first-degree murder, conspiracy, carrying a firearm without a license, carrying a firearm in public in Philadelphia, and possessing an instrument of crime (PIC).[1] We affirm.

The trial court stated the facts as follows:

> On August 5, 2009, Katora Wilson Bush travelled by bus to the 5100 block of Chester Avenue in Southwest Philadelphia from dinner with her daughter, Amirajh Wilson, and her husband, Gerald Bush. Upon disembarking the bus, all three observed an African-American teenager in a black hooded sweatshirt, later identified as the co-defendant Marquise C. Walker-Womack, following them as they walked southwest along Chester Avenue.

_____

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S. §§ 2502, 903, 6106, 6108, and 907.

As she travelled home with her family, Katora Wilson Bush observed her son, the decedent Niam Wilson Atif, at the corner near 5117 Chester Avenue talking to his neighbor Allen Bryant. During Bryant and the decedent's discussion about employment, an unidentified individual walked past the pair shouting, "it's about to go down." Seconds later, Bryant saw the African-American teenager in the black hooded sweatshirt approach the decedent from behind, draw a revolver, and shoot him three times.

Katora Wilson Bush heard the gunfire from her home eight doors away and saw her son lie bleeding on the corner of Chester Avenue and Paxton Street. Gerald Bush and Amirajh Wilson, from Katora Wilson Bush's same vantage point, watched as the teenager fled the scene along Chester Avenue.

At approximately 11:00 p.m., Philadelphia Police Officers Alexander Montes and Clara Martinez arrived at the scene and observed the decedent lying in a pool of blood emanating from a large wound in the back-right side of his head. Officer Martinez spoke to Amirajh Wilson, who described the assailant as a 5'8" African-American male in his teens, wearing a black hood.

According to Philadelphia Deputy Medical Examiner Dr. Albert Chu, an expert in forensic pathology, the decedent sustained three fatal, penetrating gunshot wounds to the left side of this head, the right side of his neck, and his center back, respectively. Each bullet penetrated a vital organ, including the brain, jugular vein, and the left lung. The medical examiner recovered three projectiles from the body and submitted them to the Firearms Identification Unit. The decedent's body did not exhibit strippling or any indication of close-range firing. Dr. Chu concluded, to a reasonable degree of medical certainty, that the manner of death was homicide caused by multiple gunshot wounds.

No more than one week after the murder, [Appellant] bragged to Harlem Boys gang members Kareem Pittman and Tayale Shelton that the co-defendant "put in some work" by killing the decedent. [Appellant] and his co-defendant told both Pittman and Shelton that [Appellant] provided the .38 Special the co-defendant used to kill the decedent. As the co-defendant described the shooting to Pittman, [Appellant] displayed the firearm used to murder the decedent. The co-defendant further

informed Shelton that he shot the decedent at [Appellant's] behest.

On October 7, 2009, Philadelphia police engaged in a foot chase with Tyreek Artis, a member of the Harlem Boys gang. Artis led police to an apartment complex at 5403 Harley Terrace and attempted to conceal himself in unit 3A. Unit 3A served as an epicenter for gang-related activity, housing several firearms and approximately sixty drug packets prepared for distribution. Inside, police discovered Artis, Pittman, and [Appellant], and recovered a loaded .38 special revolver.

Officer Jesus Cruz, a ballistics expert with the Philadelphia Firearms Investigation Unit, examined all three projectiles recovered from the decedent's body and determined that all three bullets were fired from a single firearm. Each projectile exhibited "six left twist" rifling markings, an identification characteristic used to match a projectile to the weapon that fired it. Officer Cruz concluded that the projectiles were consistent with having been fired from the .38 Special recovered at 5403 Harley Terrace, as the firearm exhibited "six left twist" characteristics.

On October 6, 2010, federal authorities indicted Pittman and Shelton pursuant to the Racketeering Influenced and Corrupt Organizations Act ("RICO"). Prior to trial, Pittman and Shelton pled guilty and entered into separate cooperation agreements. During an April 18, 2012 interview with Philadelphia Homicide Detectives John McNamee and William Kelhower, Pittman explained that [Appellant] oversaw a splinter organization within the Harlem Boys, known as the Greenway Gorillas, consisting primarily of adolescent members, and that the co-defendant Walker-Womack, known in the organization as "Littleman," shot the decedent at [Appellant's] behest. During a May 18, 2012 interview, Shelton told Detectives McNamee and Kelhower that the co-defendant confessed to shooting the decedent on [Appellant's] orders, as [Appellant] had been "beefing" with the decedent for some time prior to the shooting. Shelton further explained that the murder weapon was a community firearm that multiple gang members had access to and that [Appellant] provided it to the co-defendant.

At trial, both Pittman and Shelton described the co-defendant as a member of the Greenway Gorillas, which

- 3 -

[Appellant], as a member of the Harlem Boys, oversaw. Pittman and Shelton both testified that Greenway Gorillas members seeking to advance within the gang committed murder to impress Harlem Boys associates. The co-defendant looked up to [Appellant] in particular and sought to earn his respect and approval.

Trial Court Opinion, 8/11/16, at 2-5 (citations to notes of testimony and footnote omitted).

Appellant and Marquise Walker-Womack together were charged, tried, and convicted of the aforementioned crimes. On April 29, 2016, the trial court sentenced Appellant to an aggregate life sentence (comprised of mandatory life without parole for first-degree murder, concurrent sentences of six to twelve years for conspiracy and one to two years for carrying a firearm without a license, and no further penalty on the remaining two charges).[2]

On May 9, 2016, Appellant filed a timely post-sentence motion in which he sought a new trial and arrest of judgment based on the sufficiency and weight of the evidence presented at trial. The trial court denied the

---

[2] That same day, the trial court sentenced Marquise Walker-Womack to an aggregate sentence of 35 years to life; Mr. Walker-Womack was not subject to a mandatory life without parole sentence because he was 15 years old at the time of the murder. *See* 18 Pa.C.S. § 1102.1 (providing that a person who has been convicted after June 24, 2012 of murder of the first degree, and who was under the age of 18 at the time of the commission of the offense but was 15 years of age or older, shall be sentenced to a term of life imprisonment without parole, or a term of imprisonment, the minimum of which shall be at least 35 years to life). At this writing, Mr. Walker-Womack has an appeal pending before this Court at No. 1809 EDA 2016.

post-sentence motion on May 12, 2016. Appellant filed this appeal, in which he again presents the two evidentiary issues:

[1.] Was the evidence sufficient to sustain a conviction of first-degree murder?

[2.] Was the greater weight of the evidence against the verdict?

Appellant's Brief at 3.

Appellant first argues that the evidence was insufficient to sustain his first-degree murder conviction because "it was so inherently unreliable." Appellant's Brief at 13. Specifically, Appellant asserts that "the evidence, consisting solely of the testimony of two informants facing stiff federal sentences, was so incredible and lacking corroboration by way of physical evidence that it failed to prove [A]ppellant's guilt beyond a reasonable doubt." *Id.* at 14.

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the finder of fact while passing upon the credibility of witnesses and

the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Hicks,* 151 A.3d 216, 221–222 (Pa. Super. 2016) (citation omitted).

Appellant argues that that the Commonwealth's evidence was insufficient because it "rested solely" on the testimony of Pittman and Shelton, who "can be described as master criminals [and] violent drug dealers [whose] world was shattered when federal authorities arrested them and charged them with numerous crimes . . . that carried life sentences and which exposed them to lengthy mandatory minimum sentences." Appellant's Brief at 18-19. Appellant states:

> In an effort to reduce their sentences both men entered guilty plea agreements with authorities that required them to provide information to authorities concerning their and others['] criminal activities. In relaying this information both men implicated [A]ppellant in the murder of the victim herein.

*Id.* at 19. Appellant contends that the witnesses' "incentive to lie was so great that it rendered their testimony so unreliable that no verdict can stand" and "the witnesses had no choice other than to lie because of the life sentences they faced." *Id.*

Appellant's sufficiency argument actually is a challenge to the weight of the evidence and therefore does not entitle him to relief. *See Commonwealth v. Bristow*, 538 A.2d 1343, 1345-1346 (Pa. Super. 1988) (sufficiency analysis does not permit an examination of credibility, reliability, or weight of the evidence); *Commonwealth v. Breakiron*, 571 A.2d 1035

1042 (Pa. 1990) (sufficiency claim must accept the credibility and reliability of evidence that supports the verdict). Facing a similar argument, this Court has explained:

> A sufficiency of the evidence review . . . does not include an assessment of the credibility of the testimony offered by the Commonwealth. *Commonwealth v. Brown*, 538 Pa. 410, 438, 648 A.2d 1177, 1191 (1994). Such a claim is more properly characterized as a weight of the evidence challenge. *Commonwealth v. Bourgeon*, 439 Pa.Super. 355, 654 A.2d 555 (1994). Therefore, we find the Appellant has blurred the concepts of weight and sufficiency of the evidence. Based upon our review, it appears Appellant is raising a weight of the evidence claim.

*Commonwealth v. Wilson*, 825 A.2d 710, 713–14 (Pa. Super. 2003).

Because Appellant presents a challenge to the weight of the evidence, rather than a challenge to the sufficiency of the evidence, we find his sufficiency claim without merit and proceed to his second issue, in which he expressly assails the weight of the evidence presented at trial.

With respect to a weight-of-the-evidence claim, we have explained:

> [T]he weight attributed to the evidence is a matter exclusively for the fact finder, who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. *Commonwealth v. Forbes*, 867 A.2d 1268, 1272–1273 (Pa. Super. 2005). The grant of a new trial is not warranted because of "a mere conflict in the testimony" and must have a stronger foundation than a reassessment of the credibility of witnesses. *Commonwealth v. Bruce*, 207 Pa.Super. 4, 916 A.2d 657, 665 (2007). Rather, the role of the trial judge is to determine that, notwithstanding all of the facts, certain facts are so clearly of greater weight, that to ignore them or to give them equal weight with all of the facts is to deny justice. *Id.*
>
> An appellate court's purview:

is extremely limited and is confined to whether the trial court abused its discretion in finding that the jury verdict did not shock its conscience. Thus, appellate review of a weight claim consists of a review of the trial court's exercise of discretion, not a review of the underlying question of whether the verdict is against the weight of the evidence.

*Commonwealth v. Knox*, 50 A.3d 732, 738 (Pa. Super. 2012) (internal citations omitted). An appellate court may not reverse a verdict unless it is so contrary to the evidence as to shock one's sense of justice. *Forbes*, 867 A.2d at 1273. "[T]he trial court's denial of a motion for a new trial based on a weight of the evidence claim is the least assailable of its rulings." *Commonwealth v. Diggs*, 597 Pa. 28, 949 A.2d 873, 879–880 (2008).

*Hicks*, 151 A.3d at 223.

In challenging the weight of the evidence, Appellant admittedly recycles his sufficiency argument. *See* Appellant's Brief at 23 ("[i]n support of this argument [A]ppellant relies upon the arguments set forth in support of the first issue herein"). Appellant reiterates his contention that "the testimony of the Commonwealth's primary witnesses was not believable because both witnesses had great reason to lie and falsely accuse [A]ppellant of being involved in the murder herein given that they faced life sentences and testified against [A]ppellant in order to reduce their sentences." Appellant's Brief at 22. Appellant further contends that the testimony of Pittman and Shelton – that Mr. Walker-Womack was the shooter acting on instructions from Appellant – was contradicted by the testimony of another Commonwealth witness, a jailed informant, Michael

Williams, who stated that Appellant, not Mr. Walker-Womack, was the shooter.[3]

Significantly, although Appellant repeatedly insists that Pittman and Shelton were not credible, he fails to explain how the trial court abused its discretion in denying his weight claim. The trial court succinctly but ably stated:

> [Appellant] pursues a similar tactic in his weight of the evidence claim as he does in his sufficiency challenge: he argues that the main witnesses against him, Pittman and Shelton, provided incredible testimony, and that no eyewitness or physical evidence linked [Appellant] to the decedent's murder. Pittman and Shelton provided ample evidence that [Appellant] solicited his co-defendant to murder the decedent and provided the co-defendant with the pistol used to complete the act. N.T., 2/3/2016 at 56-62, 210-214. Ballistic examination of the projectiles recovered from the decedent's body suggested that the projectiles were fired from a weapon discovered at 5403 Harley Terrace. N.T., 2/4/2016 at 129-138. Officer Keith corroborated Pittman and Shelton's testimony that [Appellant] had access to the gun, as [Appellant] was present at 5403 Harley Terrace when the weapon was recovered. N.T., 2/2/2016 at 123-135. The jury was well aware of Pittman and Shelton's cooperation agreements with the federal government and considered them when choosing to believe their testimony. N.T., 2/3/2016 at 151-165, 268-280. The jury's verdict does not shock this Court's sense of justice.

---

[3] The Commonwealth called Michael Williams to testify on the third day of the five day trial. On direct, Mr. Williams repudiated an earlier sworn statement that Appellant had told him that he "did that shit" – meaning that Appellant shot the victim because Appellant "had to get some money." N.T., 2/3/16, at 353. Mr. Williams maintained throughout his testimony that he was induced to lie and incriminate Appellant based on the Commonwealth's unfulfilled promise to reduce his sentence. *See*, *e.g.*, *id.* at 339 (stating "y'all lied to me and told me that y'all going to give me a three-to-six if I cooperated with this and I got 17 to 34 years. . . I'm not lying for y'all no more on somebody I don't even know if he did this").

Trial Court Opinion, 8/11/16, at 9.

The trial court correctly viewed the weight issue as one of credibility that the jury resolved against Appellant. Our review of the record supports this conclusion. *See Commonwealth v. Diggs*, 949 A.2d 873, 879 (Pa. 2008) (appellate review is limited to whether the trial judge's discretion was properly exercised and relief will be granted only where the facts and inferences of record disclose a palpable abuse of discretion). The jury was free to believe the version of events related by Pittman and Shelton and not to believe the testimony of Michael Williams. Accordingly, we find no merit to Appellant's weight claim and affirm the judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/12/2017