J-S35026-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| VICTOR WESLEY HARE, III | : | |
| | : | |
| Appellant | : | No. 1334 MDA 2017 |

Appeal from the Judgment of Sentence May 11, 2017
In the Court of Common Pleas of Northumberland County
Criminal Division at No(s):  CP-49-CR-0000512-2015

BEFORE:  BENDER, P.J.E., PANELLA, J., and MURRAY, J.

MEMORANDUM BY PANELLA, J.          **FILED: NOVEMBER 9, 2018**

Victor Wesley Hare, III, appeals from the judgment of sentence entered in the Northumberland County Court of Common Pleas following his conviction for drug delivery resulting in death and related offenses. Upon careful review, we affirm.

On March 30, 2015, Appellant was charged by criminal complaint with drug delivery resulting in death, involuntary manslaughter, aggravated assault, indecent assault, as well as two counts each of endangering welfare of children ("EWOC") and recklessly endangering another person ("REAP").[1] These charges arose following the overdose death of Appellant's nine-year-old houseguest, K.R., on October 14, 2014. Following the denial of his motion

---

[1] 18 Pa.C.S.A. §§ 2506(a), 2504(a), 2702(a)(9), 3126(a)(7), 4304(a)(1), and 2705, respectively.

to change venue and his motion to dismiss due to an alleged violation of the compulsory joinder rule, this matter proceeded to jury trial on April 17, 2017.

The testimony presented at trial established the following. On the evening of October 13, 2014, Appellant invited K.R. and his thirteen-year-old brother, C.F., (collectively the "Children") to spend the night at his house. **See** N.T., Trial, 4/17/17, at 37. Appellant is related to the Children. **See id.**, at 116. After the Children arrived at Appellant's home, he prepared them dinner and gave them each a bottle of Mountain Dew. **See id.**, at 38-39.

While the Children were eating, Appellant crushed up oxycodone pills with a PedEgg[2] and used a straw to snort the crushed pills from a plate. **See id.**, at 56-57. At some point during dinner, C.F. went outside. **See id.**, at 39-41. When he came back he observed that there was something "crushed up" floating in K.R.'s bottle of Mountain Dew. **See id.** After K.R. drank the Mountain Dew, C.F. noted that K.R. was acting "weird" and "his eyes were really bloodshot." **Id.**, at 44. However, C.F. denied any allegation that K.R. would have voluntarily taken drugs by himself. **See id.**, at 63. C.F. ultimately fell asleep on a couch in Appellant's living room. **See id.**

C.F. woke during the night and discovered neither Appellant nor K.R. in the living room with him. **See id.**, at 46-47. Instead, both Appellant and K.R. were in Appellant's bedroom. **See id.** Upon finding the door to Appellant's

---

[2] C.F. described the PedEgg as a "foot grinder for dead skin." N.T., Trial, 4/17/17, at 57. Officer Nathan Fisher, a police officer involved in the case, later testified that he had experience with individuals using this particular grinder for drugs. **See** N.T., Trial, 4/18/17, at 152-153.

bedroom locked, C.F. decided to go back to sleep. ***See id***., at 50-51. At approximately 7:00 a.m., C.F. woke again to find Appellant asleep on a chair in the living room. ***See id***., at 51. C.F. went to check on his younger brother and discovered K.R. lying unresponsive on Appellant's bed. ***See id***., at 51. C.F. noted that K.R. was naked with blood and foam coming out of his mouth. ***See id***. C.F. partially dressed K.R. and rushed to alert Appellant of K.R.'s condition. ***See id***., at 51. Appellant did not immediately respond to C.F.'s pleas for help, but eventually began to perform CPR. ***See id***., at 52. Appellant called the paramedics, approximately 30-40 minutes after C.F. alerted him to K.R.'s condition. ***See id***., at 55, 60.

Once K.R. was taken to the hospital, police interviewed Appellant. Police Chief Joshua VanKirk noted Appellant appeared disconnected, was not helpful, and could not keep his story straight. ***See id***., at 120-127. However, Appellant did remark to Chief VanKirk that "he [Appellant] was the adult, that he [Appellant] was responsible." ***Id***., at 129.

In addition to interviewing Appellant, the police executed a series of search warrants on Appellant's residence. ***See*** N.T., Trial, 4/18/17, at 152. During their search, the police recovered various items including the straw, PedEgg, and a firearm. ***See id***., at 152-156, 227-228.The straw and PedEgg tested positive for oxycodone residue. ***See*** N.T., Trial, 4/19/17, at 285-286. Further, the straw contained DNA matching both Appellant and K.R. ***See id***., at 337.

Despite their best efforts, the paramedics and hospital personnel were unable to revive K.R. An autopsy revealed that at the time of K.R.'s death, he had twelve times the therapeutic level of oxycodone in his system. *See* N.T., Trial, 4/18/17, at 166; N.T., Trial, 4/19/17, at 320. The forensic pathologist testified K.R.'s death was due to this oxycodone toxicity, and that in her opinion, K.R. had ingested a large amount at once. *See* N.T., Trial, 4/19/17, at 360, 367. Additionally, the forensic pathologist confirmed that her findings were consistent with an individual snorting oxycodone. *See id*., at 368-369.

Based upon this evidence, the jury convicted Appellant of drug delivery resulting in death, involuntary manslaughter, two counts of endangering the welfare of children, and two counts of REAP.[3] The court sentenced Appellant to twenty-five to fifty years' imprisonment. This appeal follows the denial of Appellant's post-sentence motion.

Appellant first contends that the Commonwealth presented insufficient evidence to support four of his six convictions. Our standard of review for a challenge to the sufficiency of the evidence is to determine whether, when viewed in a light most favorable to the verdict winner, the evidence at trial and all reasonable inferences therefrom are sufficient for the trier of fact to find that each element of the crimes charged is established beyond a

---

[3] The jury acquitted Appellant of the charges of aggravated assault and indecent assault.

reasonable doubt. **See Commonwealth v. Dale**, 836 A.2d 150, 152 (Pa. Super. 2003).

"[T]he facts and circumstances established by the Commonwealth need not preclude every possibility of innocence." **Commonwealth v. Bruce**, 916 A.2d 657, 661 (Pa. Super. 2007) (citation omitted). Any doubt raised as to the accused's guilt is to be resolved by the fact-finder. **See Commonwealth v. Kinney**, 863 A.2d 581, 584 (Pa. Super. 2004) (citation omitted). "As an appellate court, we do not assess credibility nor do we assign weight to any of the testimony of record." **Id**. (citation omitted). Therefore, we will not disturb the verdict "unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances." **Bruce**, 916 A.2d at 661 (citation omitted). Evidence is weak and inconclusive "[w]hen two equally reasonable and mutually inconsistent inferences can be drawn from the same set of circumstances…." **Commonwealth v. Woong Knee New**, 47 A.2d 450, 468 (Pa. 1946). However, "[t]he Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence." **Commonwealth v. Gibbs**, 981 A.2d 274, 281 (Pa. Super. 2009) (citations omitted).

Appellant first challenges his drug delivery resulting in death conviction. Specifically, Appellant contends the Commonwealth failed to establish that he provided K.R. with the oxycodone later found in his system. In order to provide sufficient evidence for a conviction under 18 Pa.C.S.A. § 2506(a), drug

delivery resulting in death, the Commonwealth must prove two elements: that a defendant "(i) [i]ntentionally administer[ed], dispens[ed], deliver[ed], g[a]v[e], prescrib[ed], s[o]l[d] or distribut[ed] any controlled substance or counterfeit controlled substance and (ii) [the] death [in question was] caused by ('resulting from') the use of that drug." *Commonwealth v. Kakhankham*, 132 A.3d 986, 991-992 (Pa. Super. 2015). The Crimes Code provides that a person acts intentionally with respect to a material element of an offense

> (i) if the element involves the nature of his conduct or a result thereof, it is his conscious object to engage in conduct of that nature or to cause such a result; and (ii) if the element involves the attendant circumstances, he is aware of the existence of such circumstances or he believes or hopes that they exist.

18 Pa.C.S.A. § 302(b)(1).

Appellant does not dispute the fact that K.R. died as a result of ingesting oxycodone. However, he contends that the Commonwealth's evidence only shows that K.R. had *access* to the oxycodone in his home, but does not show that he intentionally *gave* K.R. the oxycodone.

Upon review of the record and viewing all evidence in a light most favorable to the Commonwealth, we find that there was sufficient evidence to support a finding beyond a reasonable doubt that Appellant gave K.R. oxycodone. C.F. testified that the night before K.R.'s death, he observed Appellant crushing up oxycodone with a PedEgg and snorting it through a straw. The toxicology results from the PedEgg and straw corroborated C.F.'s testimony. While Appellant was snorting the oxycodone, he provided both C.F. and K.R. with bottles of Mountain Dew. C.F. noted that K.R.'s bottle had

something "crushed up" floating in it. After K.R. finished the drink, C.F. observed that K.R. acting "weird" and his "eyes were really bloodshot." C.F. also testified that K.R. would not have taken drugs by himself.

At some point in the middle of the night, C.F. discovered that both K.R. and Appellant were locked in Appellant's room. The next time C.F. awoke, K.R. was lying nude on Appellant's bed, having succumbed to oxycodone toxicity. The forensic pathologist confirmed that the high levels of oxycodone in K.R.'s blood were consistent with an individual snorting the oxycodone. Finally, forensic testing revealed that both Appellant and K.R.'s DNA was on the McDonald's straw C.F. had observed Appellant using the night before.

Based upon this evidence, we find sufficient evidence to allow a jury to conclude beyond a reasonable doubt that Appellant "consciously" provided K.R. the oxycodone, and that this action was responsible for K.R.'s death.

Next, Appellant challenges his EWOC convictions.[4] In order to convict someone of EWOC, the Commonwealth must prove beyond a reasonable doubt that "[a] parent, guardian or other person supervising the welfare of a child under 18 years of age … knowingly endanger[ed] the welfare of the child by violating a duty of care, protection or support." 18 Pa.C.S.A. § 4304(a)(1). The statute also provides that "the term 'person supervising the welfare of a

_____

[4] For ease of disposition, we have reviewed Appellant's sufficiency challenges to his EWOC convictions and his involuntary manslaughter conviction out of order.

child' means a person other than a parent or guardian that provides care, education, training or control of a child." 18 Pa.C.S.A. § 4304(a)(3).

Appellant contends he was not a "person supervising the welfare of a child" when K.R. overdosed. Instead, Appellant argues that the Children were simply "guests" in his home and that he did not assume a duty of care, protection and support. As such, Appellant argues his convictions cannot stand.

In reviewing challenges to EWOC convictions, Pennsylvania courts have recognized that the legislature drafted this crime in an attempt to "prohibit a broad range of conduct in order to safeguard the welfare and security of our children." *Commonwealth v. Brown*, 721 A.2d 1105, 1106 (Pa. Super. 1998) (citation and internal quotation marks omitted). Therefore, we have routinely extended a duty of care to non-relatives who exercise some sort of supervisory role over a child. *See*, *e.g.*, *Commonwealth v. Trippett*, 932 A.2d 188, 195 (Pa. Super. 2007) (finding appellant a "person supervising the welfare of a child" where appellant lived with the child, provided temporary care for the child, and was the only adult present at the time he committed sexual assault against the child); *Commonwealth v. Vining*, 744 A.2d 310, 316 (Pa. Super. 1999) (finding evidence sufficient to convict appellant of EWOC where appellant accepted the role as child's babysitter).

Our review of the evidence reveals that on the night in question, Appellant was the only adult present in his home. Therefore, when Appellant invited the Children to spend the night at his home, he became their *de facto*

babysitter. Appellant recognized that he had taken on a duty of care towards the Children, as evidenced by his statement to Chief VanKirk that "he was the adult, he was responsible." *See* N.T., Trial, 4/17/17, at 129. Similar to the appellant in *Vining*, there was sufficient evidence to conclude that Appellant assumed a duty of care when he assumed the role of the Children's babysitter. Because Appellant does not challenge any other portion of the EWOC statute, his challenge to the sufficiency of the evidence underlying his EWOC convictions, fails.

Appellant's final sufficiency challenge concerns the evidence underlying his involuntary manslaughter conviction. "A person is guilty of involuntary manslaughter when as a direct result of the doing of an unlawful act in a reckless or grossly negligent manner, or the doing of a lawful act in a reckless or grossly negligent manner, he causes the death of another person." 18 Pa.C.S.A. § 2504(a). While involuntary manslaughter is typically graded as a misdemeanor of the first degree, it is considered a felony of the second degree where the fact-finder determines that "the victim is under 12 years of age and is in the care, custody or control of the person who caused the death." 18 Pa.C.S.A. § 2504(b).

Here, the only element Appellant disputes is whether the Commonwealth provided sufficient evidence to prove that K.R. was in Appellant's "care, custody or control" at the time of his death. Once again, Appellant asserts K.R. was simply a "guest" in his home at the time he overdosed, and, as such, was not in Appellant's care, custody or control.

We find sufficient evidence to support a finding beyond a reasonable doubt that K.R. was in Appellant's "care, custody or control" at the time of his death." Appellant was the only adult present in the home on the night in question. When Appellant invited nine-year-old K.R. and thirteen-year-old C.F. to spend the night at his home, he became solely responsible for their care and supervision. Again, notably, Appellant recognized this responsibility as he informed Chief VanKirk that "he was the adult, he was responsible." **See** N.T., Trial, 4/17/17, at 129. Claiming K.R. was simply a "guest" does not absolve Appellant of this responsibility. As Appellant does not challenge the sufficiency of the evidence underlying any other element of the involuntary manslaughter statute, his challenge to the sufficiency of the evidence is without merit.

Moving to his second issue on appeal, Appellant argues the verdicts were against the weight of the evidence. We do not review challenges to the weight of the evidence *de novo* on appeal. **See Commonwealth v. Rivera**, 983 A.2d 1211, 1225 (Pa. 2009). Rather, we only review the trial court's exercise of its discretionary judgment regarding the weight of the evidence presented at trial. **See id**.

"[W]e may only reverse the lower court's verdict if it is so contrary to the evidence as to shock one's sense of justice." **Commonwealth v. Champney**, 832 A.2d 403, 408 (Pa. 2003) (citations omitted). A verdict is said to be contrary to the evidence such that it shocks one's sense of justice when "the figure of Justice totters on her pedestal," or when "the jury's

- 10 -

verdict, at the time of its rendition, causes the trial judge to lose his breath, temporarily, and causes him to almost fall from the bench, then it is truly shocking to the judicial conscience." ***Commonwealth v. Davidson***, 860 A.2d 575, 581 (Pa. Super. 2004) (citations omitted).

In advancing his weight challenge, Appellant highlights his acquittal on the indecent assault and aggravated assault charges. Appellant asserts these acquittals indicate the jury did not believe the Commonwealth's theory that Appellant drugged K.R. in order to assault him. Therefore, Appellant contends his convictions are against the weight of the evidence.

After reviewing Appellant's claim, the trial court concluded that Appellant's acquittal on the indecent assault and aggravated assault charges did not invalidate his other convictions as the factfinder is free to believe "all, part, or none of the evidence presented." Trial Court Post-Sentence Motion Opinion, 7/20/17, at 8 (citation omitted). As such, the trial court concluded that the verdict did not shock its sense of justice. ***See id***. ***See also*** Trial Court Rule 1925(a) Opinion, 11/27/17, at 4 (finding Appellant's weight challenge was "without any merit on its face"). Our review of the record does not demonstrate the court abused its discretion in finding the jury's verdict reasonable. Therefore, Appellant's second issue on appeal merits no relief.

Next, Appellant challenges the trial court's denial of his motion to dismiss. Specifically, Appellant claims that his prosecution on the charges related to K.R.'s death was barred because he had already been convicted, on a separate docket, of persons not to possess firearms. Because the police

discovered the firearm that resulted in his persons not to possess firearms charge pursuant to a search warrant issued while investigating K.R.'s death, Appellant argues the Commonwealth's failure to join these cases resulted in a violation of the compulsory joinder rule.

In reviewing a challenge to the trial court's application of the compulsory joinder statute, "our standard of review is *de novo* and our scope of review is plenary." **Commonwealth v. Fithian**, 961 A.2d 66, 71 n.4 (Pa. 2008) (citation omitted). Section 110 of the Crimes Code, known as the compulsory joinder rule, bars a subsequent prosecution if each prong of the following test is met:

> (1) the former prosecution must have resulted in an acquittal or conviction;
>
> (2) the current prosecution is based upon the same criminal conduct or arose from the same criminal episode as the former prosecution;
>
> (3) the prosecutor was aware of the instant charges before the commencement of the trial on the former charges; and
>
> (4) the current offense occurred within the same judicial district as the same prosecution.

*Id*., at 72.

Only the second prong of this test is at issue here. To determine whether charges arise from the same criminal episode, the court must examine both the "temporal" and "logical" relationship among the charges. **Commonwealth v. Reid**, 77 A.3d 579, 582 (Pa. 2013). A "logical relationship" exists if there is a "substantial duplication" of either factual or

- 12 -

legal issues. *Id*. In conducting this analysis, a court should not merely compare the offenses charged, but "should also consider whether … there is 'commonality' of legal issues within the two prosecutions." *Id*., at 585-586.

Here, the only connection between the charges was that the firearm at issue in the persons not to possess firearms trial was discovered during the investigation of K.R.'s death. Besides evidence used to prove the identity of Appellant, his home address, and the reason the police were at Appellant's address, none of the evidence overlapped. And, none of the legal issues in Appellant's persons not to possess firearms trial were present in his trial relating to K.R.'s death.

We do not find Appellant was entitled to dismissal under the compulsory joinder rule. As such, the trial court did not err in denying Appellant's dismissal motion.

In his fourth issue on appeal, Appellant contends the trial court erred by denying his request for change of venue, as negative pretrial publicity had an unavoidable prejudicial effect upon potential jurors.

> A request for a change of venue or venire is addressed to the sound discretion of the trial court, which is in the best position to assess the atmosphere of the community and to judge the necessity of the requested change. Absent an abuse of discretion, the trial court's decision will not be disturbed.
>
> A change of venue becomes necessary when the trial court determines that a fair and impartial jury cannot be selected in the county in which the crime occurred. … Ordinarily, however, a defendant is not entitled to a change of venue unless he or she can show that pre-trial publicity resulted in *actual prejudice* that

> prevented the impaneling of an impartial jury. The mere existence of pre-trial publicity does not warrant a presumption of prejudice.

***Commonwealth v. Chmiel***, 30 A.3d 1111, 1152-53 (Pa. 2011) (citations omitted; emphasis added).

Appellant asserts actual prejudice was evident based upon the "animated reactions" of the jury pool during jury selection. Appellant's Brief, at 31 (noting alleged applause and light booing by the jury pool based upon the placement or removal of their fellow jurors). Conversely, the trial court notes that the reactions of the jury pool were attributable to the prolonged nature of jury selection and the proximity to their lunch break. ***See*** Trial Court Rule 1925(a) Opinion, 11/27/17 at 6.

However, although the trial testimony was transcribed, there is no transcription of the notes of testimony from jury selection. There is no indication that Appellant ever requested the transcription of the notes of testimony from jury selection. As we have no record of jury selection, there is no basis in the record on which to conclude actual prejudice occurred during jury selection. Therefore, Appellant has waived this challenge on appeal. ***See Commonwealth v. Preston***, 904 A.2d 1, 7 (Pa. Super. 2006) (*en banc*) (holding that when appellant fails to order all necessary transcripts, "any claims that cannot be resolved in the absence of the necessary transcript or transcripts must be deemed waived for the purpose of appellate review").

Finally, Appellant argues that the trial court abused its discretion by permitting the Commonwealth to introduce three highly inflammatory autopsy

photographs. Appellant contends it was unnecessary for the jury to see these photographs, as he did not dispute K.R.'s cause of death. The trial court and Commonwealth, however, posit that the admitted photographs were not inflammatory and were necessary in order visually depict K.R.'s injuries and give the jury a better understanding of the testimony presented.

The law regarding the admission of post-mortem photographs of a murder victim is well-settled:

> Photographs of a murder victim are not *per se* inadmissible …. The admission of such photographs is a matter within the discretion of the trial judge. The test for determining the admissibility of such evidence requires that the court employ a two-step analysis. First[,] a court must determine whether the photograph is inflammatory. If not, it may be admitted if it has relevance and can assist the jury's understanding of the facts. If the photograph is inflammatory, the trial court must decide whether or not the photographs are of such essential evidentiary value that their need clearly outweighs the likelihood of inflaming the minds and passions of the jurors.

***Commonwealth v. Tharp***, 830 A.2d 519, 531 (Pa. 2003) (citation omitted).

Upon examining the photographs, we find that the trial court acted within its discretion when it concluded the images depicted were not inflammatory. The three admitted photographs portrayed K.R. lying on his back on a metal examining table. While the photographs showed slight bruising and foam coming from K.R.'s mouth, as the trial court noted, "[t]hey basically did not look much different that a photograph of a sleeping child." Trial Court Rule 1925(a) Opinion, 11/27/17, at 7. The jury was not given the photographs to examine during deliberations, but rather viewed them only in connection with the testimony of the forensic pathologist.

- 15 -

Further, even assuming the photographs were inflammatory, we conclude that they were highly probative as they related directly to the requisite elements of aggravated assault and drug delivery resulting in death. Despite Appellant's assertion that they were unnecessary because he did not dispute K.R. died of oxycodone toxicity or that he had bruises, cases have consistently held that "the fact that a medical examiner can describe the victim's wounds to the jury does not render photographs of those wounds irrelevant." **Commonwealth v. Karenbauer**, 715 A.2d 1086, 1097 (Pa. 1998) (citation omitted). We do not find that the trial court abused its discretion in admitting these photographs. Accordingly, Appellant's final issue on appeal fails.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/9/2018

- 16 -