J-S40004-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| BROOKS LITTLE | : | |
| | : | |
| Appellant | : | No. 2497 EDA 2021 |

Appeal from the Judgment of Sentence Entered November 4, 2021
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s):  CP-51-CR-0004775-2019

BEFORE:  PANELLA, P.J., STABILE, J., and KING, J.

MEMORANDUM BY PANELLA, P.J.:          **FILED FEBRUARY 24, 2023**

Brooks Little appeals from the judgment of sentence entered after a jury convicted him of the first-degree murder of Tyrone Armstrong and related crimes. On appeal, Little challenges the sufficiency of the identification evidence supporting his convictions, and argues the trial court erred in not granting his pre-trial motions *in limine*. After careful review, we affirm.

The trial court summarized the factual history as follows:

On March 6, 2019, at 10:27 p.m., approximately an hour and forty-five minutes before the murder, [Little's co-defendant, Aaron Durham] called the decedent, Tyrone Armstrong, from his cell phone. At about 10:29 p.m., [Little and Durham] entered Penn Cafe Pizzeria together at 4909 Catherine Street in Philadelphia. As confirmed by video, [Little] was wearing a blue hoodie with a white Nike emblem, black gloves, tan pants, and blue shoes with thick white soles. [Durham] was wearing a black hoodie with a red shirt, black pants, and glasses. After about seven minutes, [Little] and [Durham] left together.

They walked past three storefronts and entered the Barn Bar at 4901 Catherine Street. [Little] and [Durham] stayed at the bar together for about eleven minutes. They both left the bar after [Durham] received a call from the decedent. At 10:53 p.m., they stopped in the Peeking Inn, at 4905 Catherine Street, for about a minute, before they left the area.

Over a half an hour period, [Armstrong and Durham] called each other multiple times. They last spoke at 12:02 a.m., about fourteen minutes before the murder. At 12:11 a.m., [Little, Durham, and [Armstrong], captured on video, are double parked in front of 4913 Catherine Street in the decedent's 2016 Dodge Ram. [Armstrong] was in the driver's seat with [Durham] in the front passenger seat. [Little] was by himself in the backseat.

Five minutes later, video captured the sound of the gunshot as [Little] shoots [Armstrong]. [Little] then shoots [Armstrong] three more times, as [Durham] opens his door. At 12:18 p.m., video shows [Little] putting his gun in his waistband before both men leave the scene together, walking west on Catherine Street.

[Little] and [Durham] are captured on video going back and forth to the crime scene multiple times. About thirty seconds after the shooting, [Durham] returns to the vehicle and takes a minute to wipe down the vehicle's surfaces. [Durham] leaves the vehicle and meets up with [Little] down the street. At 12:20 a.m., [Little] runs back to the vehicle and searches the back and front seat for about thirty seconds and walks off again. Approximately four minutes later, he returns to the vehicle and takes off his hoodie. He then turns his inner jacket inside out and wipes down the vehicle's surfaces again. Two minutes later, [Durham], now wearing a puffy jacket, joins [Little].

The video picks up snippets of conversation between [Little] and [Durham] at the crime scene. One of the men is heard saying: "Where's my phone ... Get it. .. Call my phone. Call my phone ... Call it right now." After this conversation, at about 12:28 p.m., [Little] puts his hoodie back on and leaves the scene with [Durham].

While this is the last time [Little] is caught on video, at 2:04 a.m., video captures [Durham] returning to the Barn bar. After about four minutes, [Durham] left the bar and went into a store down

the street for about three minutes, before leaving the scene for the last time at 2:11 a.m.

After receiving a 911 call, around 3:00 a.m., Philadelphia Fire Department medics arrived on the scene and declared [Armstrong] dead.

Philadelphia Police Department's Crime Scene Unit recovered one .45 caliber projectile, from the front passenger dash board, and four .45 caliber fired cartridge casings ("FCC"), three from the front passenger seat and one on the street outside of the front passenger side door from the scene. After the vehicle was transported to a police garage, the Crime Scene Unit recovered one .45 caliber projectile from the driver's side door panel. The Medical Examiner recovered one .45 caliber projectile from [Armstrong's] body. Officer Robert Scott, firearms identification expert from the Philadelphia Firearms Identification Unit, concluded that all of the FCCs were fired from the same .45 caliber firearm.

Dr. Lindsay Simon, Deputy Chief Medical Examiner, concluded that [Armstrong's] cause of death was multiple gunshot wounds and that the manner of death was homicide. [Armstrong] was shot twice in his forehead and once each in his neck, torso, and arm. Individually, the wounds to his forehead and neck were fatal. Dr. Simon found stippling around the forehead wounds, indicating that the barrel of the gun was two to three feet away when [Armstrong] was shot.

On March 13, 2019, Agent Jamie Linke, [Durham's] parole agent, identified [Durham]t on the surveillance footage. On May 5, 2019, Agent Jon Lukens, [Little]'s parole agent, identified [Little] on the surveillance footage. Agent Lukens had been supervising [Little] for three years and had met him in person about thirty-one times. Agent Lukens identified [Little] at trial. Agent Lukens and [Agent] Linke's occupations as parole agents were not disclosed to the jury.

On May 5, 2019, police executed a search warrant on [Little]'s home and recovered a pair of blue Nike sneakers with a white sole and tan pants, both items are consistent with the sneakers and pants worn by [Little] on the video. Tarah Helsel, a forensic scientist at RJ Lee Group, found two-component particles consistent with gunshot residue on the top of both of the sneakers.

Trial Court Opinion, 1/19/2022, at 2-5 (citations omitted). Little was arrested the same day the search warrant was executed, and charged with murder and related offenses.

Prior to trial, Little filed two motions *in limine*. The court partially granted the first motion, in which Little requested to preclude Agent Lukens from testifying that he knew Little from supervising Little's parole. The court denied the second motion, in which Little requested to preclude a detective from narrating the surveillance video during trial.

On November 4, 2021, a jury convicted Little of first-degree murder, conspiracy to commit murder, possession of an instrument of crime ("PIC"), and violations of the Uniform Firearms Act[1]. The trial court sentenced Little the same day to a mandatory term of life imprisonment without parole for first-degree murder, along with concurrent sentences for the remaining charges. This timely appeal followed.

Little raises the following issues on appeal:

1. Was the evidence of identification sufficient to convict [] Little?

2. Did the trial court abuse its discretion and commit reversible error when the court denied [] Little's motion in limine and permitted an expert witness to offer improper lay opinion testimony that intruded upon the jury's domain as factfinder?

3. Did the trial court abuse its discretion and commit reversible error when the court denied [] Little's motion in limine and

---

[1] 18 Pa.C.S.A. §§ 6101-6127.

permitted a parole agent to alert the jury that [] Little had a prior criminal offense?

Appellant's Brief, at 8.

In his first issue on appeal, Little challenges the sufficiency of the evidence supporting his convictions. Our standard of review for a challenge to the sufficiency of the evidence is to determine whether, when viewed in a light most favorable to the verdict winner, the evidence at trial and all reasonable inferences therefrom are sufficient for the trier of fact to find that each element of the crimes charged is established beyond a reasonable doubt. *See Commonwealth v. Dale*, 836 A.2d 150, 152 (Pa. Super. 2003). "The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence." *Commonwealth v. Bruce*, 916 A.2d 657, 661 (Pa. Super. 2007) (citation omitted).

"[T]he facts and circumstances established by the Commonwealth need not preclude every possibility of innocence." *Id*. (citation omitted). "As an appellate court, we do not assess credibility nor do we assign weight to any of the testimony of record." *Commonwealth v. Kinney*, 863 A.2d 581, 584 (Pa. Super. 2004) (citation omitted). Therefore, we will not disturb the verdict "unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances." *Bruce*, 916 A.2d at 661 (citation omitted). Furthermore, a mere conflict in the testimony of the witnesses does not render the evidence insufficient because

it is within the province of the fact finder to determine the weight to be given to the testimony and to believe all, part, or none of the evidence. *Commonwealth v. Baskerville*, 681 A.2d 195, 200 (Pa. Super. 1996).

Here, Little's claim relates solely to the sufficiency of the Commonwealth's identification evidence. Accordingly, we limit our discussion to the evidence for that element. *See Commonwealth v. Cain*, 906 A.2d 1242, 1244 (Pa. Super. 2006) (declining to address the sufficiency of the evidence supporting every element of an offense where the appellant raises a claim relating to one specific element); *see also Commonwealth v. Smyser*, 195 A.3d 912, 915 (Pa. Super. 2018) ("In addition to proving the statutory elements of the crimes charged beyond a reasonable doubt, the Commonwealth must also establish the identity of the defendant as the perpetrator of the crimes").

> [E]vidence of identification need not be positive and certain to sustain a conviction. Although common items of clothing and general physical characteristics are usually insufficient to support a conviction, such evidence can be used as other circumstances to establish the identity of a perpetrator. Out-of-court identifications are relevant to our review of sufficiency of the evidence claims, particularly when they are given without hesitation shortly after the crime while memories were fresh. Given additional evidentiary circumstances, any indefiniteness and uncertainty in the identification testimony goes to its weight.

*Commonwealth v. Orr*, 38 A.3d 868, 874 (Pa. Super. 2011) (*en banc*) (citations and quotation marks omitted).

Little compares the identification made in his situation to that found insufficient in *Commonwealth v. Crews*, 260 A.2d 771 (Pa. 1970). In

- 6 -

*Crews*, the defendant and his co-defendant had been convicted of robbing a cab driver. A witness identified the defendant based on her general description of a tall, light-complexioned black male wearing a gold-colored sweater. While a gold sweater was found in the defendant's home, the witness could not positively identify it as the same sweater. The only additional evidence linking the defendant to the crime was evidence that placed the defendant and the co-defendant at a bar not far from the location of the crime, and other witnesses' testimony regarding the defendant's similar height and clothing.

The Court held that where the Commonwealth's sole identification evidence is based on similar height, coloring, and clothing, the evidence is not enough to convict a defendant as the perpetrator of a crime. *See Crews*, 260 A.2d at 772. The court explained that it forced the jury to guess whether the defendant was the perpetrator. *See id*.

We find *Crews* to be distinguishable. Unlike in *Crews*, Little was not convicted based solely on evidence of similar clothing items. On the contrary, viewing the evidence in the light most favorable to the Commonwealth as the verdict winner, the certified record reveals the following evidence was presented to prove Little perpetrated the crimes charged. First, the Commonwealth presented Agent Lukens's identification of Little. Prior to Little's arrest, Agent Lukens gave a statement to police, in which he unequivocally identified Little from multiple still images taken from surveillance footage. *See id*. at 129-32, 137-39. Further, after giving an in-

court identification of Little, Agent Lukens again watched the surveillance footage and unequivocally identified Little from the footage. *See* N.T., Trial (Jury) Volume 2, 11/2/2021, at 134-35. Unlike in *Crews,* Agent Lukens testified that he had known Little for three years, and had met with him face-to-face on at least 31 occasions. *See* N.T., Trial (Jury) Volume 2, 11/2/2021, at 128. Further, the jury, as fact-finder, also had the opportunity to view the footage and was able to directly evaluate the credibility of Agent Luken's identification.

In addition to Agent Luken's strong identification evidence, the police also recovered Little's shoes, as seen in the surveillance footage, which tested positive for gunshot residue. *See id.* at 188 (highlighting the perpetrator was wearing white soled shoes); *see also* N.T., Trial (Jury) Volume 3, 11/3/2021, at 116-117 (white soled shoes found in search of Little's residence); N.T., Trial (Jury) Volume 4, 11/4/2021, at 24 (gunshot particles found on the shoes from Little's residence).

Therefore, viewing the evidence in the light most favorable to the verdict winner, we find the Commonwealth presented sufficient evidence to allow the jury to find that Little was the person who shot and killed Armstrong. Accordingly, Little is entitled to no relief on this issue.

Next, Little argues the trial court erred and abused in discretion in denying Little's motion *in limine* and permitting an expert witness to offer improper lay opinion testimony that intruded upon the jury's domain as

factfinder. In a pretrial motion *in limine*, Little sought to preclude Detective Lucke, an expert in video surveillance recovery and analysis, from narrating the surveillance footage and giving his opinions about the images in the video. Little takes issue with Detective Lucke's narration of the video as he contends Detective Lucke repeatedly gave his opinion and point of view, which was not based on specialized knowledge, regarding the appearance of footwear shown in the video. Little contends he was prejudiced by the narration because Detective Lucke's description of the shoes as "distinctive" essentially identified Little as the perpetrator. **See** Appellant's Brief, at 25.

We review a challenge to the admissibility of evidence, including the introduction of expert testimony, for an abuse of discretion:

> [o]n appeals challenging an evidentiary ruling of the trial court, our standard of review is limited. A trial court's decision will not be reversed absent a clear abuse of discretion. Abuse of discretion is not merely an error of judgment, but rather where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill will.

**Commonwealth v. Conte**, 198 A.3d 1169, 1180 (Pa. Super. 2018) (citation omitted; brackets in original).

After jury selection, but prior to the start of trial, the trial court heard from both parties regarding Little's motion *in limine*. The Commonwealth explained that because of the use of numerous different types of cameras and locations in creating the video compilation, an explanation of how color and lighting were rendered by each camera was very important to understanding

the video. Therefore, the ability of Detective Lucke to track different individuals across the different cameras and locations was useful because the view would be altered depending on the technology of the specific camera and the lighting in that scene. The trial court concluded that the narration was permitted under our caselaw, but that it would give a cautionary instruction to the jury regarding its use of the narration.

Upon review, we discern no abuse of discretion on the part of the trial court in reaching its conclusion. Detective Lucke testified that depending on the time of day of the video, and whether there was light from another source (i.e. streetlights, car lights, etc.), the camera would not be able to focus as much, causing it to switch to an infrared mode and lose color, making certain articles of clothing and other items appear greyish in color. *See* N.T., 11/2/2021, at 180-82. In order to track the two individuals shown in the compilation from scene to scene, Detective Lucke continued to focus the jury's attention on certain articles of clothing and items in the scene that changed color due to the lightning. *See id*. at 182-214.

Little particularly takes issue with Detective Lucke describing a pair of shoes shown in the video as "distinctive". Detective Lucke described the white-soled shoes repeatedly throughout the scenes, not to identify a particular person as the perpetrator, but to focus the jury's attention to the fact that the same individual could be seen in different locations. As the lighting and coloring of the different cameras and views changed, it was helpful for

Detective Lucke to explain the changes in light and color in order to track the individuals in question from scene to scene. *See Commonwealth v. Cole*, 135 A.3d 191, 196 (Pa. Super. 2016) (finding a detective's video narration "was relevant to the jury's understanding of the timing, the actors, and the location of events depicted in the video.").

Detective Lucke's narration did not identify anyone in particular as the shooter. Accordingly, Detective Lucke did not intrude upon the jury's domain as fact-finder, but rather aided the jury in understanding the surveillance compilation video in order for the jury to determine the identification of the shooter. *See Commonwealth v. Williams*, 255 A.3d 565, 576 (Pa. Super. 2021).

Further, the trial court nevertheless proceeded with extreme caution and gave three cautionary instructions to the jury to clarify the jury's role and the purpose of Detective Lucke's narration. The court instructed the jury that, as the fact-finders, it was their own perception and conclusions of the facts that controlled. Further, the court instructed the jury that while they could choose to be guided by the narration if they agreed with Detective Lucke's perception, they could also completely disregard the narration. The trial court gave these instructions prior to the narration, directly after the narration, and again at the end of trial. *See* N.T., 11/2/2021, at 175-76, 216-17; N.T., 11/4/2021, at 124. Accordingly, we find no abuse of discretion.

Finally, Little argues the trial court erred and abused its discretion in denying Little's motion *in limine* and permitting a parole agent to testify that he, as an unspecified government agent, "supervised" Little. We begin by noting that the trial court in fact partially granted Little's motion *in limine*, precluding the Commonwealth from identifying Agent Lukens as Little's parole agent. Further, there was no testimony given regarding any prior criminal offenses.

Nonetheless, we understand Little's argument on appeal to be focused on the trial court's subsequent denial of defense counsel's request that Agent Lukens be permitted to testify only that he "managed" Little. Little contends that allowing to Agent Lukens to use the word "supervised" was sufficient to alert the jury to his status as a parolee.

At a motions hearing held three weeks before trial, defense counsel requested that Agent Lukens's title as Little's parole agent be "sanitized", or unknown to the jury, as well as the fact that Little was on parole. The Commonwealth agreed and suggested that Agent Lukens instead be identified not as Agent, but simply by his first and last name as someone employed by a State Agency. **See** N.T., Motions Hearing, 10/7/2021, at 9-10. The trial court granted the motion. **See id**. at 14 ("... I'm going to grant the motion.").

On November 1, 2021, after jury selection took place, defense counsel requested clarification of how the relationship between Little and Agent Lukens would be described, and subsequently requested that a different description

of the relationship, other than "supervised", be used. N.T., Trial (Jury) Volume 1, 11/1/2021, at 175-76. The court stated it would consider any alternatives provided by the next day, while maintaining that it found "supervised" to be appropriate. *Id*. at 176-78. The next day, outside the presence of the jury, defense counsel proposed the word "managed." N.T., Trial (Jury) Volume 2, 11/2/2021, at 98. The trial court rejected this alternative, as it would improperly imply an employee relationship, and concluded the term "supervised" would be used. *Id*. At trial, Agent Lukens testified as agreed upon above. *See id*. at 127-28.

We conclude the trial court did not abuse its discretion. Any accurate term used by Agent Lukens to describe his relationship with Little would risk allowing sharp jurors to infer his parole status. When faced with an array of imperfect options, the trial court made a good faith effort to find a word that was fair to both parties. The record does not support any finding that the court's ruling was based on bias, ill-will or irrationality. Accordingly, this claim is without merit.

As we find none of Little's issues merit relief, we affirm the judgment of sentence.

Judgment of sentence affirmed. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/24/2023